734 A.2d 817 (1999)
324 N.J. Super. 149
NEW YORK SMSA LIMITED PARTNERSHIP, d/b/a Bell Atlantic Nynex Mobile, Plaintiff-Respondent,
v.
BOARD OF ADJUSTMENT OF THE TOWNSHIP OF BERNARDS, Somerset County, New Jersey, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 1999.
Decided August 3, 1999.
*819 Thomas J. Bitar, Morristown, for defendant-appellant (Dillon, Bitar & Luther, attorneys; Mr. Bitar, of counsel; Steven F. Ritardi, Roseland, on the brief).
Richard D. Stanzione, Toms River, for plaintiff-respondent (Hiering, Dupignac & Stanzione, attorneys; Mr. Stanzione, on the brief).
Before Judges SKILLMAN, PAUL G. LEVY and LESEMANN.
*818 The opinion of the court was delivered by LESEMANN, J.S.C. (temporarily assigned).
This is one of an apparently proliferating number of cases dealing with cellular telephone towers and their interaction with municipal land use regulations.[1] Plaintiff New York SMSA Limited Partnership, d/b/a Bell Atlantic Nynex Mobile (SMSA), applied to the Board of Adjustment of the Township of Bernards in Somerset County, claiming that construction of such a tower on a particular parcel of land was a necessary part of the "seamless" network of telephone reception which it was creating for the users of its service. Following six hearing sessions, the Board adopted a twenty-three page resolution denying the variance.
On an appeal by SMSA, the Law Division reversed that determination and entered judgment granting the variance. However, it remanded the matter to the Board to consider "the imposition of reasonable conditions," presumably with a view toward mitigating whatever adverse effects might otherwise flow from the variance. The Board did impose certain conditions, and the matter was then returned to the Law Division which refused to set aside any of the conditions and also declined to modify its prior judgment. The Board then appealed to this court.
Applying the standards set out in Smart SMR of New York, Inc. v. Borough of Fair Lawn Board of Adjustment, 152 N.J. 309, 704 A.2d 1271 (1998),[2] we conclude that the Board of Adjustment acted reasonably and consistent with the principles set out in Smart, that the Board's decision was based on substantial evidence in the record, and that the Law Division should not have overturned that determination. Accordingly, we reverse.
Plaintiff's request was to construct a 150 foot high telephone transmission tower (frequently referred to as a "monopole") to close what it described as a "gap" in its service. The gap includes a three mile portion of Interstate Route 78 and, according to plaintiff's experts, the gap would be eliminated by construction of the proposed monopole. Without that tower, however, telephone communication in the affected area would remain as it is now, with calls to and from automobiles either being adversely affected or sometimes completely *820 terminated as they pass through the "dead" zone.
The nature of cellular telephone transmissions requires such towers at intermittent locations. A tower designed to service a particular area can accomplish that only if it is located within a prescribed radius from which its signals can reach all of the area.[3] Plaintiff claimed it investigated twenty-seven other sites which could theoretically have met its needs. Its representatives testified, however, that all of those sites either failed to meet technical requirements, or for some reason, were unavailable. Plaintiff thus settled on the site in question here, a ninety acre tract on which a residential school for emotionally disturbed adolescent boys (the Bonnie Brae School) is located. The site is in a P-1, Public Purpose Zone, which permits public or institutional uses such as hospitals, recreational facilities or educational facilities, but not commercial or industrial uses. The proposed transmitting tower is not a permissible use within that zone, nor would the height of the tower comply with the zoning ordinance's limiting schedule. In fact, 150 feet would exceed the height limitations for all zones in the municipality.
Plaintiff claimed that it needed the requested variance in order to fulfill its obligation to those using its services. It also claimed that the proposed tower would have no adverse effect on the municipality's zoning plan or on the surrounding area. It noted that the nearest residences (condominium units) were located 600 feet from the proposed tower in one direction and 1,300 feet in the other direction. To the north of the site is a park complex, a municipal pool and a Veterans' Administration Hospital. To the south is a twentytwo acre vacant parcel, also owned by the Bonnie Brae School, and farther to the south is a tract owned by the Township, much of it characterized by wetlands. To the east, the townhouse development, which is 1,300 feet from the site, includes 526 dwelling units between three and seven years old, ranging in value between $140,000 and $240,000. The development which lies 650 feet to the west consists of 812 units which sell for between $110,000 and $125,000 per unit. Between the proposed tower location and the residential complexes, however, there are no trees which could effectively screen the tower from the homes.
During the hearings before the Board, SMSA presented its technical experts to describe the present gap in its service coverage and the need for the proposed tower to fill that gap. On appeal, the Board contends that SMSA did not establish the claimed need because there was no testimony of specific complaints from plaintiff's customers to corroborate the inability to transmit or receive calls in the "dead" area. However, plaintiff presented more than ample technical evidence as to the existence of the gap, none of which was contradicted. The fact that users may not have registered complaints, or an inability to show how many customers suffered from such poor service, is not inconsistent with the uncontradicted evidence presented. The existence of the coverage gap and the desirability of filling it is clear.
The applicant's proof as to why it had to place its tower on this specific site, however, was less compelling. Although it did testify to the unavailability or unsuitability of twenty-seven sites it investigated, it did not demonstrate that there might not be other sitesavailable and suitablewhich could meet its need and be less intrusive *821 in the neighborhood in which it would be located.
Plaintiff also presented the testimony of a real estate expert who claimed the tower would have no adverse effect on the value of the abutting townhouse properties. He based that opinion on surveys he had performed in other areas, but he conceded that the properties he had previously studied were expensive, single-family dwellings and not lower-priced townhouses. He thought the latter would be less sensitive to the presence of the tower, but that conclusion was not based on studies he had examined. He also referred to a number of other studies which varied in their conclusions, but he found most credible one which indicated that residential units located 600 feet or more from transmission towers experienced no decline in market value from the towers.
A planning expert also testified for plaintiff. He said that the topography of the propertyhigher at the north end than at the south endand its proximity to Route 78 made it well suited for the proposed use. He described the use as relatively benign, because of the absence of noise, traffic, odor or other such negative factors. He acknowledged, however, that the major detriment caused by monopoles is their visibility. He added that while vegetation could not be used on this property to screen the tower from the adjacent residential properties, that negative factor was offset somewhat by the distance between the tower and those properties.
He also noted that permitted uses within the P-1 zone included such uses as hospitals, schools, or lights on an athletic field, which could be built within seventy-five feet of the property line and would thus havein his opiniona more detrimental impact than the proposed monopole. He also acknowledged that the Township's master plan encouraged residential development of the Bonnie Brae site should it cease being used for a school.
Opposition to the variance focused on three issues: (1) an expressed concern that a monopole located on property which was also used as a residential center for emotionally disturbed adolescent boys might well act as an attractive nuisance and pose a danger to the boys; (2) the height of the monopole and its visibility from surrounding properties would adversely affect property values and create an undesirable visual impact; and, (3) there were more suitable sites within the Township, which plaintiff should have explored in more detail.
The Board also expressed its concern with those issues. It retained and presented the testimony of a planning expert, who said that the major negative factor arguing against the variance was the location of the proposed tower close to the two densely populated residential developments. He said that because of the height of the tower and the impossibility of effective screening through natural vegetation, "regardless of the distance, it [the tower] will have an impact in terms of daily comings and goings to that neighborhood in terms of view and a change of character of their neighborhood."
The applicant, inexplicably, declined to respond adequately to the Board's expressed concern over the "attractive nuisance" issue. It seemed to indicate that the officials of Bonnie Brae (which owned the tract and was leasing a portion to plaintiff) were uninterested in appearing at the Board hearings. Plaintiff told the Board that Bonnie Brae's participation in the rental demonstrated that it obviously had no concern about the potential danger to its students. Plaintiff did not say that school officials had flatly refused to appear before the Board, nor did it explain why (even if faced with such a refusal) it could not present evidence on the issue from some other source. For whatever reason, plaintiff presented nothing substantial on the attractive nuisance question and indicated that the Board should be *822 satisfied by the implicit approval (or at least non-objection) from Bonnie Brae.
The Board's resolution denying the requested variance was comprehensive. It included findings of fact, statements of conclusion, and a detailed weighing of the benefits and detriments of the application which led to its ultimate conclusion that the detriments outweighed the benefits. Before discussing that resolution, however, we will turn to the recent decision of our Supreme Court in Smart SMR of New York v. Borough of Fair Lawn Board of Adjustment, supra.
When this case was presented to the Board of Adjustment, and thereafter when it was first presented to the Law Division, there was considerable uncertainty as to some of the legal principles governing applications such as thisparticularly whether such a use constituted an "inherently beneficial use" and how a board should approach the statutory "negative criteria" in such a case. Much of that uncertainty has been put to rest by Smart.
A brief recapitulation of the preSmart status of special reasons variances may be helpful. N.J.S.A. 40:55D-70d deals with "special reasons" variances that is, a variance to permit a use otherwise prohibited in a particular district. One seeking such a variance must satisfy the affirmative criteria of the statute by demonstrating a "special reason" to grant the variance; and must also satisfy the "negative criteria" by "showing that such variance ... can be granted without substantial detriment to the public good and [that it] will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." Ibid.
"Special reason" variances are divided into two categories: those in which the proposed use is "inherently beneficial" such as a nursing home (Urban Farms, Inc. v. Borough of Franklin Lakes, 179 N.J.Super. 203, 431 A.2d 163 (App.Div.), certif. denied, 87 N.J. 428, 434 A.2d 1099 (1981)); or a hospital for the emotionally disturbed (Kunzler v. Hoffman, 48 N.J. 277, 225 A.2d 321 (1966)). In such cases, it is the general welfare itself which constitutes the "special reason," and the need or benefit of the facility need not be related to the site for which the variance is being sought. Id. at 286, 225 A.2d 321; Urban Farms, Inc., supra, 179 N.J.Super. at 211, 431 A.2d 163.
The second category of special reasons includes those which are not inherently beneficial. There, one seeking to demonstrate a "special reason" must show that "the use is particularly suited for the proposed site." See, e.g., Medici v. BPR Co., 107 N.J. 1, 526 A.2d 109 (1987); Kohl v. Mayor and Council of Fair Lawn, 50 N.J. 268, 234 A.2d 385 (1967).
Regardless of whether a proposed special reason is "inherently beneficial," an applicant for such a variance must still satisfy the negative criteria of the statute. But the nature of the required showing differs depending on whether the use is "inherently beneficial" or not. If it is not "inherently beneficial," the applicant must present what has been termed "an enhanced quality of proof" and there must be "clear and specific findings by the board of adjustment that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." Medici v. BPR Co., 107 N.J. 1, 21, 526 A.2d 109 (1987). That proof must "reconcile the proposed use variance with the zoning ordinance's omission of the use from those permitted in the zone...." Ibid.
If, however, the proposed use is "inherently beneficial," then the standard for meeting the negative criteria is somewhat relaxed. The "enhanced" standard of proof is not required, and instead the board of adjustment employs a balancing test:
First, the board should identify the public interest at stake.... Second, the Board should identify the detrimental effect that will ensue from the grant of *823 the variance.... Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use.... Fourth, the [b]oard should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.
[Sica v. Board of Adjustment of Tp. of Wall, 127 N.J. 152, 165-66, 603 A.2d 30 (1992).]
In Smart, supra, the Court called for a treatment of telephone tower variance requests which is something of an amalgamation of the approach to inherently beneficial and non-inherently beneficial uses. First, the Court concluded that such towers are not "inherently beneficial uses." Thus, one seeking a use variance for such a tower must satisfy the "positive criteria" of the statute by demonstrating that "the use is particularly suited for the proposed site." 152 N.J. at 331-32, 704 A.2d 1271. With respect to the negative criteria, however, the Court concluded that,
we will weigh, as we would with an inherently beneficial use, "the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good." Sica, supra, 127 N.J. at 166, 603 A.2d 30....
[Id. at 332, 704 A.2d 1271.]
Thus, in considering the application in this case, the Board of Adjustment was required, first, to determine whether SMSA had demonstrated a "special reason" by showing that its monopole "is particularly suited for the proposed site." Assuming plaintiff met that burden, the Board thereafter was required to weigh the factors outlined in Sica, and reiterated in Smart, to determine whether "on balance, the grant of the variance would cause a substantial detriment to the public good."
Here the Board of Adjustment determined that the applicant failed to meet its burden, both with respect to the positive and the negative criteria of the statute. There is ample evidence in the record to support those conclusions.
First, the parcel was not zoned to permit commercial uses. (Compare Smart where, although the 150 foot tower was not permitted by the terms of the ordinance, the parcel was located in a commercially zoned district. See also New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield, 160 N.J. 1, 18, 733 A.2d 442, which involved a zone where industrial uses were permitted and residential uses prohibited.) Second, the topography precludes effective screening and makes unavoidable the negative effect of the unsightly tower on the residences both east and west of the site. Third, the master plan's designation of the site for future residential use (if it is not used or required for Bonnie Brae's school purposes) is inconsistent with construction of the tower. Fourth, the ongoing use of the site as a school for disturbed boys raises substantial questions of suitability which, as noted above, were never adequately addressed by the applicant. And, finally, while the applicant referred to twenty-seven other sites it had examined, it did not claim or demonstrate that there was no other suitable or adequate site that could meet its needs. Its reference to twenty-seven sites which were explored does not negate the possible existence of others that might have served better and been less intrusive but which were not discussed.[4]
As to the negative criteria, the Board performed precisely the "weighing" analysis described in Sica and endorsed in Smart. As the first step in that four-part analysis, the Board identified and dealt with the "nature of the public interest" involved in the variance application. It *824 concluded that while there was a public interest in "perfecting coverage of one of several cellular telephone facilities operating in this municipality," that interest was "not very compelling." It referred to the applicant's failure to identify customer complaints of any "dropped" calls, stated that the applicant "should not be relieved of the burden of seriously searching for a location for an antenna site which minimizes the detrimental effect on the zone plan," and concluded by noting that the applicant had "not suggested that the site selected is the only reasonable available location which would meet its networking needs."
We need not determine whether we agree with the Board's conclusion that the public interest in perfecting service here is "not very compelling." The Telecommunications Act of 1996 (TCA)[5] has indicated a public interest in improving such service. And see the Court's statement in New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Board of Adjustment, supra, 160 N.J. at 14, 733 A.2d 442 that "with telecommunications towers, an FCC license generally establishes that the use promotes general welfare." To the extent that the Board's resolution refers to an absence of specific complaints from customers, or focuses on needs within Bernards Township (rather than the needs of those passing through or near the Township), the resolution is not persuasive. However, we do not regard those factors as essential parts of the Board's decision, and we do find reasonable and valid the significance the Board attaches to the applicant's failure to demonstrate the nonexistence of other suitable locations, particularly given the negative factors inherent in this site.
As the second step of the weighing process, the Board identified the "detriment" inherent in the proposed use. In that respect, it referred to the "intrusion" of this "commercial project, including its 150 foot monopole" on school grounds between "two high density townhouse communities." It found that use "wholly inappropriate, and inconsistent with the zone plan and zoning ordinance," and said that such a use "would be immeasurably more suitable in a commercial setting." It also concluded that the testimony of the applicant's real estate expert "lacks credibility," and it set out the Board's reasons for that conclusion. It noted that the Board continued to "be concerned about the safety and welfare of the troubled boys and young men attending and residing at Bonnie Brae." It found the concern that the boys might regard the monopole "as a challenge to their physical abilities is a significant consideration."
With respect to the possible imposition of conditions to ameliorate negative features of the variance, the trial court noted the applicant's offers to landscape the tract, install a fence, provide lighting, install an alarm system, remove "all reachable rungs to the monopole," paint the monopole a color of the Board's choice and have the monopole "disguised in the form of a tree or bell tower." The Board concluded, however, that "no amount of buffering which might be imposed as a condition of a site plan approval could substantially conceal or screen this project from view."[6]
Finally, in weighing the benefits and the detriments, the Board first noted that it regarded the benefits of the proposed use here as "significantly less compelling than, say, the head trauma facility in Sica ...." It also found that, *825 the intrusion of the proposed use into an existing school for troubled youths and adjacent high density residential communities is immediate and visible, and in the view of the Board, is substantially detrimental to the public good and substantially impairs the intent and purpose of the zone plan and zoning ordinance. Accordingly, the Board is convinced that the public welfare and zoning detriments far outweigh any incremental public benefit to be provided by the project.
In reviewing that determination, the question is not whether the trial court or this court would have reached the same determination as that reached by the Board. Rather, the question is whether the determination is supported by the evidence in the record, or whether the determination is arbitrary and unreasonable.
Actions of a board of adjustment are presumed to be valid and the party attacking such action has the burden of proving otherwise. Kramer v. Board of Adjustment of Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965); Charlie Brown of Chatham v. Board of Adjustment, 202 N.J.Super. 312, 321, 495 A.2d 119 (App.Div.1985). A determination by a Board of Adjustment will be set aside only if the court is satisfied that the board's decision is arbitrary, capricious or unreasonable. Kramer v. Board of Adjustment of Sea Girt, supra, 45 N.J. at 296-297, 212 A.2d 153; Booth v. Board of Adjustment of Rockaway, 50 N.J. 302, 306, 234 A.2d 681 (1965). Because of their expertise and knowledge of local conditions, boards of adjustment have wide latitude in the exercise of their delegated discretion. Booth v. Board of Adjustment of Rockaway, supra; Charlie Brown of Chatham v. Board of Adjustment, supra; Bove v. Board of Adjustment of Borough of Emerson, 100 N.J.Super. 95, 101, 241 A.2d 252 (App.Div. 1968). The role of a court reviewing a decision by a board of adjustment is strictly circumscribed: The court will not substitute its judgment for that of the board, and the board's action will be set aside only if the court finds a clear abuse of discretion. Medical Realty Assocs. v. Board of Adjustment of City of Summit, 228 N.J.Super. 226, 233, 549 A.2d 469 (App.Div.1988). And the deference given to a board of adjustment is even greater when the board has denied a variance than when it has granted such relief. Cerdel Constr. Co., Inc. v. Township Comm. of E. Hanover, 86 N.J. 303, 307, 430 A.2d 925 (1981).
For the reasons noted above, there is ample basis for the Board's conclusions here. One could hardly dispute the finding that the monopole would be an intrusive presence in the general neighborhood and on the nearby residences. That effect cannot be adequately mitigated by screening or landscaping, nor would the tower be attached to, or replace in some way an existing use which might mitigate its adverse effect. (Again, compare Smart, where the proposed new tower would replace an existing tower and thus the net increase in any intrusive effect would be relatively small). Significant too, is the unresolved question of the danger and potential threat to the well being of the Bonnie Brae studentsan issue which, as noted, the applicant for some reason refused to deal with. Given the absence of a showing that this was the only site available to meet the needs of plaintiff's system, a determination that the negative factors outweighed the positive ones was certainly reasonable and clearly sustainable.
We disagree with plaintiff's claim that the TCA placed the burden of persuasion in cases such as this on the local board of adjustment rather than the applicant seeking a variance. The TCA enacted requirements that a board set out its findings in writing (47 U.S.C.A. § 332(c)(7)(B)(iii)), that those findings be supported by substantial evidence in the record, ibid., that a board not completely prohibit such facilities nor discriminate against providers of such services, 47 U.S.C.A., § 332(c)(7)(B)(i)(I)(II), and that a *826 board not consider certain technical objections reserved to federal agencies, 47 U.S.C.A. § 332(c)(7)(B)(iv). However, nothing in the Act shifts the burden of proof to a board of adjustment or deprives it of authority to render decisions in the manner prescribed by our Municipal Land Use Law. N.J.S.A. 40:55D-1 to 136 (MLUL). Indeed, in Smart, the Court considered the TCA at some length and noted that, "in certain respects, the Telecommunications Act's restrictions on the power of local land use agencies parallels restrictions already imposed under the MLUL and the Radiation Acts." Smart, supra, 152 N.J. at 326, 704 A.2d 1271. Nothing in Smart suggests that the TCA had the radical effect of reversing the burden of persuasion on a variance application. See also, New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Board of Adjustment, 305 N.J.Super. 151, 170-71, 701 A.2d 1281 (App.Div. 1997).
Finally, we note that after the decision in the Law Division, the municipality apparently adopted an ordinance which permits monopoles on property owned by the municipality and also treats such towers as conditional uses in a number of districts within the Township (although not the zone here in question). There was some indication that plaintiff might be able to meet its coverage needs by the combination of an antenna on a municipally owned building together with another antenna on a building along Route 78. However, that possibility seems not to have been pursued. Obviously, following our decision on this appeal plaintiff will be free to pursue such alternatives as it deems appropriate. If anything, the possibility of those alleged alternative locations reinforces the Board's conclusion that plaintiff did not demonstrate a need to place its tower on this inappropriate site.
The decision of the Law Division is reversed.
NOTES
[1] This case was argued on the same day as New York SMSA Limited Partnership v. Board of Adjustment of the Tp. of Middletown, 324 N.J.Super. 166, 734 A.2d 826 (1999) also decided this day, in which we reached a result similar to that here.
[2] Smart was decided after the Law Division rendered its initial decision, but before the court considered the case further upon its return after the Board imposed its conditions.

As this opinion was about to be filed, the Supreme Court decided New Brunswick Cellular Tel. Co. v. Borough of S. Plainfield Board of Adjustment, 160 N.J. 1, 733 A.2d 442 (1999); AWACS, Inc. v. Clemonton Zoning Board of Adjustment, 160 N.J. 21, 733 A.2d 453 (1999). We have examined those opinions, and we are satisfied that nothing herein is inconsistent with those decisions.
[3] The tower itself does no transmitting. Rather, sending and receiving devices are attached to the tower, with a particular tower normally accommodating more than one such instrument. The tower proposed here would be 150 feet high. Near the top would be a platform extending an additional six feet high, on which nine antennas would be located: three for transmitting and six for receiving.

In addition to the tower, the facility would include a "cellular base station," consisting of a twelve foot by thirty-two foot unmanned building ten feet high.
[4] As discussed further below, there were in fact indications of other possible available sites, and there was no adequate explanation of why the applicant apparently rejected or at least failed to follow up on those sites.
[5] The TCA is Pub.L. No. 104-104, 110 Stat. 56, and is codified as amendments to various sections of 15 U.S.C.A., 18 U.S.C.A. and 47 U.S.C.A.
[6] The Board referred to the small size of the tract being leased from Bonnie Brae (forty feet by seventy feet). However, after the trial court reversed the Board but remanded the matter for consideration of such conditions, the Board successfully demanded that the applicant expand the leased area to three acres.