800 A.2d 891 (2002)
352 N.J. Super. 514
OCEAN COUNTY CELLULAR TELEPHONE COMPANY d/b/a Comcast Cellular One, Plaintiff-Appellant,
v.
TOWNSHIP OF LAKEWOOD BOARD OF ADJUSTMENT, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued telephonically April 25, 2002.
Decided June 3, 2002.
*893 Gregory J. Czura, Ringwood, argued the cause for appellant (Czura Stilwell, attorneys; Mr. Czura, on the brief).
John F. Russo, Jr., Toms River, argued the cause for respondent (Mr. Russo, on the brief).
Before Judges HAVEY, BRAITHWAITE and WEISSBARD.
*892 The opinion of the court was delivered by HAVEY, P.J.A.D.
Once again we are called upon to decide whether a zoning board's denial of a special reasons variance application made by a telecommunications provider is sustainable under New Jersey's land use principles. Plaintiff Ocean County Cellular Telephone Company, d/b/a Comcast Cellular One (Comcast), seeks to erect twelve antennae on an existing multi-story building in Lakewood, Ocean County. According to its written resolution, the Board denied Comcast's application because of: (1) the "detrimental visual impact" the antennae will have; (2) the public's "fear and apprehensions" about radio frequency (RF) emissions; and (3) the existence of other suitable locations for the proposed facility. The trial court upheld the denial. It concluded that the Board was not arbitrary or unreasonable in determining that other suitable sites were available, and in finding that citizen concern about RF emissions, "although unfounded according to government standards was nonetheless real." We reverse. We conclude that, based on the uncontradicted evidence submitted by Comcast, it satisfied both the positive and negative criteria under N.J.S.A. 40:55D-70d necessary to obtain a special reasons variance.

*894 I
Comcast is licensed by the Federal Communications Commission (FCC) to provide cellular telephone coverage in New Jersey, including Lakewood Township. It operates existing facilities in Lakewood and surrounding areas. However, because it was experiencing inadequate service capability for its customers, it applied for a variance pursuant to N.J.S.A. 40:55D-70d, a height variance, and site plan approval for the installation of a cellular telephone facility on the top of the Beth Medrash Govoah Dormitory (BMG building) in downtown Lakewood. The BMG building is located in the residential, office-professional zone (ROP), or hotel district, which has among its principle uses professional offices, churches and other houses of worship, and residential dwellings. Comcast seeks to erect twelve antennae on top of the forty-five foot high BMG building and to construct an equipment shed on its roof. The antennae would be installed on the building's elevator penthouse and, upon installation, would extend approximately seven feet above the penthouse roof. The antennae are forty-eight inches high, six to eight inches wide, and approximately six inches deep.
The BMG building serves as a residence for 1,000 rabbinical students, as well as a school facility attended by approximately 400 children and two synagogues.
During the Board hearing, Comcast presented the testimony of a radio frequency engineer, a design engineer, a professional planner, and two experts in the field of health risks associated with exposure to RF emissions. Jason Young, Comcast's radio frequency engineer, introduced various exhibits and testified in detail about the existence of a substantial "gap" in service in the Lakewood area due to an inordinate number of calls made from the BMG Building. He explained Comcast's current operating network, including facilities in the Jackson and Brick Township areas, and concluded that in order to alleviate the problem in Lakewood, Comcast needed to erect a new facility near the coverage problem area that would be capable of "downloading or helping with the capacity problems" that Comcast is now experiencing.
William Dieal, the design engineer, described the physical characteristics of the proposed antennae. Doctors Marvin Ziskin, a Professor of Biomedical Physics, and Robert Foster, a Ph.D in physics and a professional engineer, defined state and FCC standards concerning RF emissions and concluded that the emissions from the proposed facility would be substantially lower than both FCC and state accepted levels. James Miller, a professional planner, gave detailed testimony concerning the particular suitability of the site in question for the proposed facility. Specifically, he stated that the facility was compatible with existing uses in the area and uses permitted in the ROP zone. Building on Young's testimony, Miller testified that the proposed facility needed to be in the center of Comcast's search area in order to provide optimum capacity, and noted that the nearest industrial zone was well beyond Comcast's search area. Miller also engaged in the balancing test articulated in Sica v. Wall Bd. of Adjustment, 127 N.J. 152, 165-66, 603 A.2d 30 (1992), and concluded that the positive aspects of the proposed use outweighed any detrimental impact that may ensue from the grant of the variance.
No expert was presented by any interested party or by the Board. Various members of the public expressed a distrust of FCC standards and voiced concerns about exposing young children to the potential effects of RF emissions. Similarly, Board members stated that they had a *895 "gut feeling" about the danger to the "thousand children" residing in the BMG building. One simply stated, "I am afraid of the site." Another observed that the proposal should be "away from any inhabited area."
As noted, the Board adopted a formal resolution denying the application for the following reasons: (1) the detrimental visual impact from the antennae; (2) the fear and apprehensions that the RF emissions would cause to parents of the school children and neighbors; and (3) the presence of other locations in the area that would be better suited for the requested use. The resolution added:
[T]he Board FINDS, CONCLUDES AND DETERMINES that the potential detriment to the public by approving the proposed use, and the general trepidation of parents and immediate neighbors outweigh any benefit to the public in approving the use. There are other sites which are more particularly suited to the use.

II
The land use principles applicable in this case are now well settled. Judicial review of a zoning board's decision is ordinarily limited. The decision is deemed "`presumptively valid, and is reversible only if arbitrary, capricious, and unreasonable.'" Smart SMR of New York, Inc. v. Bor. of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 327, 704 A.2d 1271 (1998) (quoting Sica, supra, 127 N.J. at 166-67, 603 A.2d 30). The issue for the reviewing court is whether the board's decision is "supported by the record and is not so arbitrary, capricious, or unreasonable as to amount to an abuse of discretion." Smart, supra, 152 N.J. at 327, 704 A.2d 1271.
In order to obtain a variance under N.J.S.A. 40:55D-70d, an applicant must prove both the so-called positive and negative criteria. The positive criteria require that "special reasons" for granting the variance be established. Sica, supra, 127 N.J. at 156, 603 A.2d 30. The negative criteria require proof that the variance can be granted "without substantial detriment to the public good" and that it "will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70d.
If a proposed use is inherently beneficial, the positive criteria are presumptively satisfied. Smart, supra, 152 N.J. at 323, 704 A.2d 1271. This is so because such uses, by their very nature, serve the general welfare. See Medici v. BPR Co., 107 N.J. 1, 12-13, 526 A.2d 109 (1987) (and cases cited therein). In Smart, supra, 152 N.J. at 333, 704 A.2d 1271, the Court came close, but fell short of, declaring that telecommunications facilities are inherently beneficial uses.[1] Recently, the Court declined to revisit this issue and modify Smart's holding that such facilities are not inherently beneficial uses. Cell South of New Jersey v. West Windsor Zoning Bd. of Adjustment, 172 N.J. 75, 83, 796 A.2d 247 (2002).
However, the Court in Smart held that an FCC license generally establishes that *896 the use promotes the general welfare. Smart, supra, 152 N.J. at 336, 704 A.2d 1271. Nevertheless, the applicant must demonstrate that the proposed telecommunications facility is particularly suited for the proposed site, that is, the need for the proposed use at the particular location chosen by it. Id. at 332, 704 A.2d 1271. See also Medici, supra, 107 N.J. at 4, 526 A.2d 109; Kohl v. Mayor & Council of Fair Lawn, 50 N.J. 268, 279, 234 A.2d 385 (1967); New Brunswick Cellular Tel. Co. v. So. Plainfield Bd. of Adjustment, 160 N.J. 1, 14, 733 A.2d 442 (1999).
Resolution of the "particularly suited" issue necessarily implicates special considerations when the proposed use is a telecommunications system. It is one thing for a zoning board to deny an expansion of a nonconforming dairy on the basis that there was no showing by the applicant that the municipality and surrounding area were dependent upon the expansion to provide adequate milk supply. See Kohl, supra, 50 N.J. at 280, 234 A.2d 385. It is another matter when the board denies a variance application for a telecommunications facility by concluding that the capacity or coverage of existing systems is adequate to service the area without the additional facility proposed by the provider. It seems clear that the siting and design aspects of a telecommunications proposal often involve technical considerations not implicated in other applications. Congress recognized this potential for local disruption of the nationwide telecommunications network by enacting the Telecommunications Act (TCA), 47 U.S.C.A. § 332 (West Supp.1997) (hereinafter referred to as § 332).
The TCA was "intended to promote competition by limiting the ability of local authorities to regulate and control the expansion of telecommunications technologies." Omnipoint Communications Enterprises v. Newtown Tp., 219 F.3d 240, 242-43 (3rd Cir.), cert. denied, 531 U.S. 985, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000). Thus, state statutes and local ordinances are preempted under the Supremacy Clause of the United States Constitution if they are in conflict with the TCA. Town of Amherst v. Omnipoint Communications Enterprises, Inc., 173 F.3d 9, 16 (1st Cir. 1999). Although the TCA expressly preserves local zoning authority over the placement, construction and modification of personal wireless service facilities, § 332(c)(7)(A), it places several substantive and procedural limitations on a local board's power to deny an application for a telecommunications facility. Two such provisions of the TCA are pertinent here. First, § 332(c)(7)(B)(i)(II) provides that local regulation "shall not prohibit or have the effect of prohibiting the provision of personal wireless services."
Second, § 332(c)(7)(B)(i)(II)(iii), provides that a local decision to deny a facility must be "supported by substantial evidence contained in a written record." In the context of this section, "the decision process itself is governed by applicable state and local zoning laws." Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho-Ho-Kus, 197 F.3d 64, 72 (3rd Cir.1999). The Court in Smart observed that this section of the TCA parallels New Jersey law, which requires that an agency decision be supported by sufficient evidence in the record. Smart, supra, 152 N.J. at 326, 704 A.2d 1271. Significantly, however, the "substantial evidence" standard, and the traditional deference given to local board findings, do not apply to § 332(c)(7)(B)(i)(II), the TCA's statutory bar against regulatory prohibition. In such a case the record is subject to a de novo review. Ho Ho Kus, supra, 197 F. 3d at 76; APT Pittsburgh Ltd. P'ship v. Penn Tp., 196 F.3d 469, 475 (3rd Cir.1999).

*897 III
Before deciding whether the Board's denial violated the TCA's statutory bar under § 332(c)(7)(B)(i)(II), it is appropriate to address whether, under principles of traditional state land use law, the Board's denial was arbitrary, capricious or unreasonable and unsupported by sufficient evidence in the record. Smart, supra, 152 N.J. at 325-27, 704 A.2d 1271. This is the logical sequence since, as noted, in the context of the "substantial evidence" standard under the TCA, the zoning board's decision process is governed by substantive state and local zoning laws. Ho-Ho-Kus, supra, 197 F.3d at 71-72. See also Cellular Tel. Co. v. Zoning Bd. of Adjustment of Harrington Park, 90 F.Supp.2d 557, 563 (D.N.J.2000).
We first address the positive criteria under N.J.S.A. 40:55-70d. As noted, Comcast is licensed by the FCC to provide wireless communications to the Lakewood area. The Court in Smart observed that "[a] telecommunications facility is a paradigm for a use that serves a greater community than the particular municipality," 152 N.J. at 332, 704 A.2d 1271, and that "the issuance of an FCC license should suffice for a carrier to establish that the use serves the general welfare." Id. at 336, 704 A.2d 1271. Nevertheless, Comcast must still demonstrate the particular suitability of its site.
In Smart, the Court did not specifically address what quantum of proof is necessary to satisfy the "particularly suited" standard, except to say that the applicant had met the standard because: (1) of the relevancy of the TCA's proscription against regulations and local decisions having the effect of prohibiting wireless service facilities, § 332(c)(7)(B)(i)(II); (2) the site was zoned for industrial use and was centrally located within Smart's search area; and (3) the site already accommodated a ninety-foot monopole. Smart, supra, 152 N.J. at 332, 704 A.2d 1271. In So. Plainfield, supra, 160 N.J. at 14, 733 A.2d 442, the Court found that the applicant satisfied the "particular suitability" standard because existing capacity was "inadequate," the proposed site would "redress that lack of capacity," and the applicant could not use existing facilities at alternative sites. In AWACS, Inc. v. Clemonton Zoning Bd. of Adjustment, 160 N.J. 21, 25, 733 A.2d 453 (1999), the Court found adequate the applicant's submission of a map demonstrating an inadequacy of "signal strength" in the area and concluded that the proposed site was particularly suited to relieve that inadequacy.
In this case, Comcast presented compelling evidence demonstrating that its site was particularly suited for its proposed antennae facility. Young, Comcast's radio frequency engineer, presented an exhibit entitled "Lakewood Area Rejected Calls in One Hour/All Day on July 19, 1999." The exhibit showed that, in a designated area in downtown Lakewood, Comcast experienced over 4,000 "blocked" calls in a one-hour period. Young determined that this significant blockage was due to an inordinate number of calls made by the students at the BMG building during a specific hour of the day. It was his opinion that customer demand was simply greater than the present system could handle and that the proposed antennae facility would eliminate the blocking problems in the downtown Lakewood area.
Young testified that to resolve the problem, it was appropriate, from a design point of view, to identify "the approximate location where the customers are trying to make the calls," and put the facility "in the middle of the need," thereby "greatly improv[ing] your ability to solve that problem." No competing evidence, expert or otherwise, was presented by any interested *898 party or the Board to counter Young's testimony.
Moreover, the proposed site is located in a zone which includes a mixture of uses, including single- and multi-family dwellings, professional offices and schools. Comcast's planning expert, James Miller, testified that the site was particularly suited for the proposed antennae facility because the BMG building is located in the center of the search area and, moreover, Comcast is utilizing an existing structure, rather than constructing a monopole or lattice tower. It was Miller's view that such a monopole or tower would be incompatible with existing uses in the area. He added that the antennae were "akin" to the type of appurtenances normally found on rooftops, such as antennae for televisions and radios, as well as vent pipes to service multi-family facilities.
The Board did not address Comcast's proof of particular suitability.[2] Instead, it stated in its resolution that "there are other sites which are more particularly suited to the use."
In Smart, So. Plainfield and AWACS, no mention is made by the Court in its "particularly suited" discussion as to what extent, if any, a telecommunications provider must present proof that it has examined and rejected other sites in the area for its proposed facility. Our court's discussion of the issue has been limited.
For example, in Yahnel v. Bd. of Adjustment of Jamesburg, 79 N.J.Super. 509, 518-19, 192 A.2d 177 (App.Div.), certif. denied, 41 N.J. 116, 195 A.2d 15 (1963), we upheld the grant of a special reasons variance to New Jersey Bell Telephone Company to construct an equipment maintenance building in a residential zone. We noted that one of the findings of the Board was that no other "entirely suitable" vacant land was available within Bell's wire center area for its proposed use. Id. at 518, 192 A.2d 177. In upholding the grant of the variance as serving the "general welfare," Judge Conford observed that the Court in Andrews v. Ocean Tp. Bd. of Adjustment, 30 N.J. 245, 249-251, 152 A.2d 580 (1959), a case involving a variance for a parochial school, "did not make it a condition that the applicant show that the school could not be established in some other location entailing less injury to nearby property owners...." Yahnel, 79 N.J.Super. at 517, 192 A.2d 177.[3] Thus, Judge Conford was of the view that the court "need not decide" whether a board should require an applicant to prove that other sites are unsuitable or unavailable, but added that if such proof is necessary:
we cannot say that the affirmative finding of the board on the point on the proofs offered was arbitrary or not grounded in the evidence, although a more detailed explanation by the company of the unavailability or unsuitability of other sites in the business area would have been more satisfying.
[Id. at 518, 192 A.2d 177.]
In New York SMSA Ltd. P'ship v. Bd. of Adjustment of Bernards Tp., 324 *899 N.J.Super. 149, 734 A.2d 817 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1210 (1999), another panel of this court observed that a zoning board, in concluding that the site in question was not particularly suited for a proposed telecommunications tower, properly considered the fact that, although the applicant had reviewed and rejected as unsuitable twenty-seven other alternate sites, it failed to "negate the possible existence of others that might have served better and been less intrusive but which were not discussed." Id. at 161, 734 A.2d 817. The court upheld the denial of the variance for other reasons as well, including the unsuitability of the tower on a site housing disturbed boys, the master plan's designation of the site for future residential use and the "negative effect of the unsightly tower" on the nearby residences. Id. at 160-61, 734 A.2d 817.
During oral arguments before us, Comcast asserted that, at least in the context of telecommunications facilities, proof that alternative sites are unsuitable or unavailable should not be required. Comcast argues that the imposition of such a condition expands the Kohl/Medici/Smart requirement that the proofs must focus on the peculiar characteristics of the proposed site that make it particularly suited for the facility in question.
However, as suggested by both Yahnel and Bernards Tp., a provider's reasonable and good faith effort to find an alternative, less-intrusive site is clearly relevant to the "particularly suited" analysis.[4] The provider's conclusion that no such alternative site exists must be based on competent expert testimony. That conclusion, of course, is subject to challenge by interested parties or the Board itself, provided that the challenge has a rational and factually grounded basis.
What concerns us, however, is the prospect of arbitrary action based on the court's suggestion in Bernards Tp. that a telecommunications provider must "negate the possible existence [of other sites] that might have served better and been less intrusive but which were not discussed." 324 N.J.Super. at 161, 734 A.2d 817 (emphasis added). This observation might be wrongly interpreted as giving zoning boards carte blanche power to reject an application based on conjecture that a "possible" alternative site is both suitable and available.[5] To require the applicant to disprove the "possible existence" of these sites may be a daunting, if not impossible task because of the uncertainty as to the availability of such sites, as well as the physical variables that may render them unsuitable. Moreover, placement of the proposed facility on the alternative site will require a variance where, as in Lakewood Township, no zone permits telecommunications facilities of any type. The grant of such a variance is by no means predictable, considering the fact-sensitive issues implicated in proving special reasons and in *900 applying the balancing test under Sica, supra, 127 N.J. at 165-66, 603 A.2d 30.
In this case, Comcast presented substantial, uncontradicted evidence that no other site was available or reasonably suitable to provide the enhanced capacity necessary to fill the gap in service. First, Lakewood's master plan and zoning ordinance, at the time of Comcast's application, did not permit telecommunications systems of any type anywhere in the municipality. See So. Plainfield, supra, 160 N.J. at 13, 733 A.2d 442 (noting that the Borough's master plan "has neither expressly zoned for telecommunications facilities nor identified appropriate sites" for such facilities); see also Smart, supra, 152 N.J. at 334-36, 704 A.2d 1271 (encouraging municipalities to adopt ordinances identifying zones and sites for such facilities). Consequently, by defaulting, Lakewood "has forced [Comcast] to take the initiative in locating [a] suitable site[ ]." So. Plainfield, supra, 160 N.J. at 15, 733 A.2d 442.
Second, Young specifically addressed the question of alternative sites raised by the Board. Five alternative sites were studied. One site, 930 Park Avenue, was rejected because it was raw land and outside of the search area. The Levowitz Apartments and Strand Theater sites, existing structures, were not available because the owners had no interest in leasing their rooftops. A local fire company locale, cited by the Board in its appellate brief as a reasonable alternative site, was deemed unsuitable because it was a raw land area and required construction of a monopole or lattice tower. As noted, Comcast's planning expert presented unrefuted testimony that construction of such a tower would be incompatible with the Town's zoning scheme and existing structures in the area. The last alternative site, a nearby water tank, was rejected because a propagation study revealed that the site, because of its location and other technical limitations, could not service the search area. The Board presented no evidence challenging Young's testimony, and no expert or even laywitness was produced indicating that other, less intrusive sites were available and suitable.
Finally, as to the positive criteria, we reiterate Smart's observation that "[r]elevant to the determination of the suitability of a telecommunications site" is the TCA's mandate that state and local regulations or zoning board decisions concerning the placement of wireless service facilities "`shall not prohibit or have the effect of prohibiting the provision of personal wireless services.'" Smart, supra, 152 N.J. at 332, 704 A.2d 1271 (quoting § 332(c)(7)(B)(i)(II)). This provision is relevant in this case because the Board argues, for the first time in its appellate brief, that the quality of Comcast's proof of a "gap" was wanting. Referring to Young's testimony that over 4,000 calls were blocked in a one-hour period, the Board contends, citing Sprint Spectrum v. Willoth, 176 F.3d 630, 643-44 (2nd Cir. 1999), "this one-hour problemwhenever it really washardly seems to even qualify as a `gap in service,' due to the fact that the TCA does not even require that de minimus gaps be filled."
The District Court in Cellular Tel. Co. v. Zoning Bd. of Adjustment of Ho-Ho-Kus, 24 F.Supp.2d 359, 372 (D.N.J.1998), aff'd in part and rev'd in part, 197 F.3d 64 (3rd Cir.1999), upheld the denial of a conditional use variance application by a telecommunications provider, pointing out that "at best" the provider demonstrated that there were gaps in service, "not that service is unavailable." The District Court concluded that "the FCC does not mandate optimal service but only substantially better than mediocre service." Ibid. It added:

*901 As long as the Board's decision was not an attempt to prohibit personal wireless service altogether, to discriminate among providers, or to impermissibly base its denial upon the environmental effects of radio frequency emissions, local land use law is controlling.

[Id. at 373.]
In New York SMSA Ltd. P'ship v. Bd. of Adjustment of the Tp. of Middletown, 324 N.J.Super. 166, 176, 734 A.2d 826 (App.Div.), certif. denied, 162 N.J. 488, 744 A.2d 1210 (1999) this court agreed with the District Court in Ho-Ho-Kus, observing:
The TCA, at 47 U.S.C.A. § 332(c)(7)(B)(i)(II), states that local zoning authorities "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." But here, as in the Ho-Ho-Kus case, there is neither a moratorium nor a blanket prohibition, just one decision in a municipality that permits wireless facilities in other locations.
The Third Circuit in Ho-Ho-Kus, supra, 197 F.3d at 75-76, subsequently reversed in part and affirmed in part the District Court's order sustaining the variance denial. The court held that local zoning decisions have the effect of prohibiting wireless communication services if they result in "significant gaps" in the availability of wireless services. Id. at 70 (citing Willoth, supra, 176 F.3d at 643). The provider must also show that the manner in which it proposes to fill the significant gap is the least intrusive means reasonably available. Ho-Ho-Kus, supra, 197 F.3d at 70; see also APT Pittsburgh, supra, 196 F.3d at 480 (same). The court remanded for such an analysis. Ho-Ho-Kus, supra, 197 F.3d at 70.
We need not decide in this case whether, applying the Third Circuit's analysis in Ho-Ho-Kus, the Board violated the statutory bar under the TCA. However, as in Smart, the TCA's mandate is relevant to the need and particular suitability issues because it places the local board on notice that, although it may consider the quality of existing services in deciding the variance application, there is an absolute bar prohibiting denial of the application if the provider meets the "significant gap" and "least intrusive means" standards articulated by the federal courts. In this case, the Board completely overlooked that mandate. It rejected, without factual or scientific support, Comcast's compelling evidence that a significant gap in fact exists, and that the proposed site was the least intrusive means for closing the gap.

IV
Comcast also had the burden of satisfying the negative criteria under N.J.S.A. 40:55D-70d; that is, the variance may be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the zoning plan and zoning ordinance.
Ordinarily, in a case involving a use not inherently beneficial, the applicant is faced with "an enhanced quality of proof... that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." Medici, supra, 107 N.J. at 21, 526 A.2d 109. However, presumably because telecommunications systems, although not inherently beneficial, are licensed and serve the general welfare, the Court in Smart and So. Plainfield opted to apply the following, less-stringent balancing test under Sica, supra, 127 N.J. at 165-66, 603 A.2d 30, applicable to traditional inherently beneficial uses.
When striking the balance:
"First, ... [the local land use] board should identify the public interest at stake. Some uses are more *902 compelling than others.... Second, the Board should identify the detrimental effect that will ensue from the grant of the variance.... Third, in some situations, the local board may reduce the detrimental effect by imposing reasonable conditions on the use. If so, the weight accorded the adverse effect should be reduced by the anticipated effect of those restrictions.... Fourth, the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good."
[Smart, supra, 152 N.J. at 324, 704 A.2d 1271 (quoting Sica, supra, 127 N.J. at 165-66, 603 A.2d 30 (citations omitted)).]
As noted, the Board identified two factors bearing on the negative criteria: (1) aesthetic reasons; that is, "detrimental visual impact from the antennae"; and (2) the "fear and apprehensions of the parents as well as neighbors" of RF emission exposure.
As to aesthetics, it must be emphasized that Comcast proposes twelve antennae which will exceed the existing BMG building roof line by approximately 7 feet, not a 140 foot or 150-foot monopole. See e.g., Smart, supra, 152 N.J. at 333, 704 A.2d 1271 (holding that increasing the size of a monopole from 90 feet to 140 feet did not offend aesthetics because the increase "would not substantially alter the [Borough's] skyline"); see also Bernards Tp., supra, 324 N.J.Super. at 154, 734 A.2d 817 (150 foot monopole). Also, Comcast's design engineer explained that the antennae will be color coordinated with the building in order to minimize the "visual impact" from street level. He stated that the only aspect of the facility that will be seen from street level will be "a little bit" of the accessory building and antenna panels, and a "little bit of" a wire to be installed along the face of the building. We have been furnished and have examined the exhibits presented by Dieal depicting similar antennae placed on other facilities. Based on Dieal's testimony and the exhibits, and the absence of any contrary evidence, we are entirely satisfied that the aesthetic impact will be minimal. See Nynex Mobile Communications Co. v. Hazlet Tp. Bd. of Adjustment, 276 N.J.Super. 598, 612, 648 A.2d 724 (App.Div.1994) (finding extension of antenna by eight to ten feet on top of existing water tower was "aesthetically inconsequential and a minimal intensification of the nonconformity").
That leaves, as a basis for the Board's denial, the "fear and apprehensions" of parents of students and neighbors about RF emission exposure.
Smart held squarely that both New Jersey's Radiation Protection Act, N.J.S.A. 26:2D-1 to -88, and the TCA preempt local consideration of EMF radiation emissions. 152 N.J. at 333-35, 704 A.2d 1271. Smart cites § 332(c)(7)(B)(i)(II)(iv), which provides that:
No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.
Comcast presented the testimony and reports of Doctors Ziskin and Foster detailing the type and level of energy to be transmitted from the antennae. Dr. Ziskin concluded that even in the worse case scenario, exposure levels to people living on the top floor "lying up against the roof," would be "four times lower than the national *903 standard." Dr. Foster added that both the FCC and New Jersey have promulgated standards with respect to exposure limits and concluded that "at all places of roof exposure the level of exposure is certainly below [the State and federal] limits...." When asked about occupants residing in the upper floor of the BMG building, Foster explained:
[M]ost of the energy goes right out to the horizon. The amount of signal that gets inside the building is extremely low.

....
The exposure standards include any length of time exposure. There is no cumulative effect.
....
[T]he energy comes out of the antennas in a narrow beam headed away from the building. Only a very tiny amount of energy goes down, and virtually none goes back into the building. That is simply not an issue.

[Emphasis added.]
As to the possibility of exposure to a person who climbs onto the roof, Foster stated:
I examined that issue quite carefully.... [F]irst of all, the roof is just barely accessible up there. You have to crawl over. It's hard to get to. It's not easily accessible or not normally accessible to the public.
My calculationsI assumed that the maximum level of transmission that Comcast would use, which usually is a factor of two higher than what they plan to use....
....
If a person is on the roof within about ten feet to fifteen feet from one set of antennas ... [r]ight at head level, six feet above the floor or level of the roof, it would marginally exceed the state limits but still would be within the federal limits. But that is twice as much energy as is intended.... If people are exposed at head level, the exposure is still below the limits.

[Emphasis added.]
Nevertheless, the trial court accepted as reasonable the Board's finding that residents had expressed fear and apprehension about the RF emissions. Acknowledging Smart's determination that federal and state law preempt consideration of such emissions when the provider demonstrates that the emissions will fall within applicable governmental standards, see 152 N.J. at 333-34, 704 A.2d 1271, the trial court found that "there existed in the community a fear and apprehension of danger which although unfounded according to government standards was nonetheless real." (Emphasis added).
Essentially, the trial court adopted a subjective standard; if interested parties express a subjective fear of the possible long-term health effects of RF emissions, unsupported by scientific evidence, a zoning board may accept such fear as a legitimate "detrimental effect" when engaging in the balancing test under Sica. We know of no authority for such a proposition. Indeed, Smart expressly holds that "[i]n light of state and congressional legislation, the Board exceeded its authority in giving credence to the perception of neighbors that EMF radiation emissions may cause long-term health effects." Smart, supra, 152 N.J. at 333, 704 A.2d 1271 (emphasis added). Likewise, here, the Board exceeded its authority by giving credence to the public's unfounded perceptions about RF emissions. "By affording undue weight to the residents' unsubstantiated testimony, the Board disregarded the weight of the evidence in the record in determining to deny [the provider] its variance." Cell *904 South of New Jersey, supra, 172 N.J. at 86, 796A.2d 247.
In addition, the Board failed to engage in a meaningful balancing of the positive and negative criteria as required by Sica. Our independent application of that process persuades us that, based on the uncontradicted evidence, the requested variance may be granted without substantial detriment to the public good. The facility will serve the public interest by filling a clearly identified gap in Comcast's coverage, and will "further the congressional goal of competition among providers of commercial mobile services." Smart, supra, 152 N.J. at 332-33, 704 A.2d 1271. Further, the general welfare will be served because, as Comcast's planning expert explained, thirty-five percent of all 911 emergency calls in New Jersey originate from wireless phones, and filling the gap in this case will assure that such calls are not unnecessarily blocked.
The "detrimental" effects will be minimal. As noted, erection of the antennae will be aesthetically inconsequential. Further, Comcast's design engineer noted that the facility "doesn't generate any noise [or] glare, no odors, vibrations [or] traffic." He added that the antennae will be color-blended with the building and are of a type "typically" found on rooftops of mid-rise buildings. Further, unlike monopole towers, the facility will not be incompatible with existing uses in the area.
Finally, Comcast agreed to accept any reasonable condition proposed by the Board to reduce any perceived "detrimental effect" that may ensue from the grant of the variance. Sica, supra, 127 N.J. at 166, 603 A.2d 30. The Board declined to consider such reasonable conditions.

V
One additional observation. We have reached our conclusion that Comcast satisfied the positive and negative criteria necessary for the grant of a special reasons variance based upon the uncontradicted testimony presented by its experts. We recognize that the Board was free to either accept or reject the testimony of those experts. "`Where reasonably made, such a choice is conclusive on appeal.'" Kramer v. Bd. of Adjustment of Sea Girt, 45 N.J. 268, 288, 212 A.2d 153 (1965) (quoting Reinauer Realty Corp. v. Nucera, 59 N.J.Super. 189, 201, 157 A.2d 524 (App. Div.), certif. denied, 32 N.J. 347, 160 A.2d 845 (1960)).
However, in this case, we question whether the Board could have "reasonably" rejected the witnesses' testimony. The experts presented written reports and generally relied on data and accepted methodology in reaching their conclusions. Moreover, as noted, no evidence was presented to challenge their reports or testimony. In addition, the Board, neither during the hearings nor in its resolution, ever questioned or rejected the experts' testimony. For example, in its resolution the Board did not state that the experts lacked credibility. See Bernards Tp., supra, 324 N.J.Super. at 162, 734 A.2d 817 (noting that the Board had found that the applicant's real estate expert "lacks credibility"). Indeed, during the hearings Board members found Comcast's witnesses to be highly qualified. Consequently, there is no basis for us to conclude that the Board made a "reasonable" choice to disregard the evidence presented by the experts.
Reversed.
NOTES
[1] In declining to characterize such facilities as inherently beneficial uses, the Supreme Court in Smart stated:

Although the issue is not before us, we might reach a different result with a facility that does not require a tower or monopole, such as one that simply involves appending antennas to an existing structure.
[Id. at 331, 704 A.2d 1271.]
In this case, Comcast could have, but has not pressed the argument that its antennae proposal, as opposed to a tower or monopole facility, should be considered an inherently beneficial use.
[2] In its appellate brief, the Board claims that Eugene Oross, its planner, rendered the opinion that other areas of the township are "more conducive for such a facility...." In fact, what was read into the record was merely Oross' written suggestion to the Board that it make the following inquiry of Comcast during the hearing: "Can [the] antenna[e] be located in an area of [the] township more appropriately suited for such a facility ... namely within the M-1 zone or Industrial zone of the township"?
[3] Andrews has been cited as a case involving an inherently beneficial use. See Medici, supra, 107 N.J. at 12, 526 A.2d 109. For that reason, the Andrews Court may have concluded that it was unnecessary to prove the nonavailability of other sites.
[4] The availability of alternative sites is relevant if the provider claims that the variance denial violates the TCA because it has the "effect" of prohibiting the provision of personal wireless services. § 322(c)(7)(B)(i)(II). A finding of such prohibition requires a showing not only of a "significant gap" in coverage, but that the manner in which the provider proposes to fill the significant gap is the least intrusive means reasonably available. Ho-Ho-Kus, supra, 197 F.3d at 70. An available and suitable alternative site might be the least intrusive means of fulfilling the gap.
[5] In fact, there was some "indication" in Bernards Tp. that plaintiff might have been able to meet its coverage needs by installing antennae facilities on municipality-owned and private buildings in the area. According to the court, the applicant did not pursue these alternative sites. Bernards Tp., supra, 324 N.J.Super. at 165, 734 A.2d 817.