**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2471-22

CT07 SPII, LLC, and DT07 SPII, LLC,

      Plaintiffs-Respondents/
      Cross-Appellants,

v.

ZONING BOARD OF ADJUSTMENT
OF THE TOWNSHIP OF MONROE,

      Defendant-Respondent/
      Cross-Appellant,

and

TOWNSHIP OF MONROE and
MAYOR GERALD W. TAMBURRO,
in his official capacity as Mayor of the
TOWNSHIP OF MONROE,

      Defendants-Appellants/
      Cross-Respondents.

_____

Argued November 7, 2024 – Decided March 7, 2025

Before Judges Currier, Paganelli and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-3953-19.

Louis N. Rainone argued the cause for appellants/cross-respondents Township of Monroe and Mayor Gerald W. Tamburro (Rainone Coughlin Minchello, LLC, attorneys; Louis N. Rainone, of counsel; Matthew R. Tavares, of counsel and on the briefs).

Thomas F. Carroll, III, argued the cause for respondents/cross-appellants CT07 SPII, LLC, and DT07 SPII, LLC (Hill Wallack, LLP, attorneys; Thomas F. Carroll, III, of counsel and on the briefs).

Peter A. Vignuolo argued the cause for respondent/cross-appellant Zoning Board of Adjustment of the Township of Monroe (Clarkin & Vignuolo, PC, attorneys; Peter A. Vignuolo, of counsel and on the briefs).

PER CURIAM

Defendants, Township of Monroe (Township) and Mayor Gerald W. Tamburro[1] (Mayor) appeal, and defendant, Zoning Board of Adjustment of the Township of Monroe (Board) cross-appeals from trial court orders of: (1) October 14, 2020, appointing a Special Hearing Officer (SHO), in place of the Board to hear plaintiffs', CT07 SPII LLC's, and DT07 SPII LLC's, applications for preliminary and final site plan approval; (2) October 15, 2020 that: (a)

---

[1] During the pendency of this cause of action, Mayor Gerald W. Tamburro passed away on December 31, 2020.

A-2471-22

reversed the Board's denial of plaintiffs' application for use variance and bulk variance relief, and approved plaintiffs' application in its entirety, and (b) implemented the procedures for the SHO; (3) June 16, 2021 and September 14, 2021 that modified the October 15, 2020 order; and (4) August 9, 2022, that adopted the SHO's recommendations and granted plaintiffs preliminary and final major site plan approval. We address these orders in section II of our opinion, and reverse and vacate them.

In section III of our opinion, we address plaintiffs' cross-appeal from the trial court's order of March 10, 2023, that granted defendants' motion for summary judgment as to certain counts of plaintiffs' complaint and denying plaintiffs' claims for damages and attorney's fees. We affirm that order.

I.

In June 2015, the Township filed a declaratory action seeking a determination that its housing plan met Mt. Laurel[2] obligations. Fair Share Housing Center (FSHC) and others were permitted to intervene in the action.

---

[2] "The Mount Laurel series of cases [Southern Burlington County NAACP v. Township of Mount Laurel, (Mt. Laurel II) 92 N.J. 158 (1983); Southern Burlington County NAACP v. Township of Mount Laurel, (Mt. Laurel I) 67 N.J. 151 (1975),] recognized that the power to zone carries a constitutional obligation to do so in a manner that creates a realistic opportunity for producing a fair share

In March 2016, the Township and the intervenors entered into a "Settlement Agreement," wherein the parties requested the Superior Court to "find th[e Settlement] Agreement, and the approach to meeting the Township's Prior Round and Third Round Mount Laurel obligations, . . . [we]re fair to the interests of lower-income New Jerseyans and entitle[d] the Township to protection from Mount Laurel litigation for a period of ten years." The agreement was signed by the Mayor and the intervenors.

The Settlement Agreement included "[a] summary chart of the Township's plan . . . for meeting [its] fair share obligations." The summary was to be adopted so that it conformed with "the Township's formal Housing Element and Fair Share Plan [(HEFSP)]."

In October 2016, the court executed a "Declaratory Judgment Of Compliance And Repose." The judgment stated that "through the adoption of the 2016 HEFSP and the implementation of that plan and the Settlement Agreement," the Township "satisfies its obligations under the Mount Laurel

_____

of the regional present and prospective need for housing low-and moderate-income families." In re N.J.A.C. 5:96 & 5:97, 221 N.J. 1, 3 (2015).

doctrine and Fair Housing Act of 1985."[3]  Further, "[t]he Township [wa]s granted repose and immunity from exclusionary zoning litigation by" the judgment.  The judgment stated that "[t]he Township's 2016 HEFSP, implementing Affordable Housing Ordinance and zoning amendments are approved by the [c]ourt as an acceptable plan . . . ."

Property listed in the Settlement Agreement lies at the heart of this dispute.  In 2016, the Board approved an application for a project on the property spanning approximately forty-eight acres and containing 65,000 square feet of retail space and 206 apartments, forty-three of which would be affordable housing.

In 2017, a bald eagle's nest was discovered on the property.  To ensure its protection, a 660-foot buffer zone was required around the eagle's nest.  After accommodating for the buffer zone, the buildable lot size reduced to approximately thirty-five acres.  Plaintiffs and the Township's professional employees met five times to discuss a new design for the project. Plaintiffs sought the Mayor's participation in the meetings—"to confirm that the [M]ayor

---

[3]  "The Legislature enacted the Fair Housing Act of 1985 (FHA or the Act), N.J.S.A. 52:27D-301 to -329, to assist in municipal compliance with that constitutional obligation." N.J.A.C. 5:96 & 5:97, 221 N.J. at 4.

. . . would support [the] approach"—but were advised that he was unavailable and to continue to work with the Township's professionals.

The project was redesigned to accommodate for the buffer zone and plaintiffs submitted an amended application for approximately 43,000 square feet of retail space, with the same number of apartments and affordable units.

On March 19, 2019, the Mayor issued a press release ("initial press release"). The release stated:

> Monroe Mayor Calls for Zoning Board to Reject
> Proposed SPII-LLC Housing Development on
> Route 33
>
> Mayor Tamburro Says Environmentally-Sensitive
> Area Can't Be Home to 206 Apartments and Retail
>
> MONROE TOWNSHIP — March 19, 2019 — The Monroe Township Zoning Board is expected to hear an amended application on Tuesday, March 26 that would bring 206 new housing units and retail to an environmentally-sensitive area of Monroe, at the Millstone River.
>
> Mayor Gerald Tamburro said the area is home to a bald eagle's nest perched near the Millstone River. Under state and federal law, it can be illegal to construct buildings within 660 feet of the nest.
>
> The proposed developer of the [forty-eight]-acre parcel, which sits on Route 33 between Applegarth Road and the East Windsor border, informed the Township in 2018 that the bald eagle nests on the property. Under the federal Migratory Bird Treaty Act

6

and the Bald and Golden Eagle Protection Act, it is unlawful to harm eagles, their nests, or eggs.

Since the discovery of the nest, the developer, SPII-LLC. reconfigured the development plan, increasing the project density to the frontage of the highway to maintain the same number of housing units in the updated proposal.

"I've not been pleased with this proposal since its inception; it is yet another way in which developers use state affordable housing mandates to force more development into towns," said Tamburro, noting the proposal would include [forty-two] court-mandated affordable units. "And now, the developer is still trying to squeeze as much development as possible onto this site, even with a bald eagle nesting ground. To me, this is absolutely unacceptable."

To comply with the 660-foot buffer, the developer now has less land on which to build. In response, the original plans, which called for mostly townhouses, ha[ve] been replaced with four-story apartment buildings -- with the amount of commercial space being slashed to make room for the concentrated housing.

"The developer could have easily reduced the amount of housing units to lower the density and create an appropriate buffer to protect the bald eagle," the [M]ayor said. "But, instead, the plan calls for building rental apartments, some of which will be on top of reduced retail space right on Route 33. It will be unsightly, unnecessary and not in the best interest for Monroe."

The proposed site, at 1099 Route 33 west, is now mostly a farm.

A-2471-22

Monroe residents are encouraged to attend the Zoning Board meeting at 7 p.m. next Tuesday (March 26) at the municipal building.

"As the [Z]oning [B]oard votes, eaglets are beginning to hatch on the Millstone River," Tamburro said. "Our community needs to stand up in full force against the SPII-LLC housing project. I am proud to lead the charge."

On March 26, 2019, the Board held a hearing on plaintiffs' amended application. At the outset of the hearing, the Board's attorney cautioned the Board members that:

before we proceed to help clarify things for everybody involved, specifically the [B]oard members. As I'm sure everyone is aware, judging by the size of the crowd in the room, the [M]ayor had sent out an email blast on March 19 and it was also picked up by the local papers. I caution the [B]oard and the public, this is not evidence in this hearing. The only thing that the [B]oard can consider is evidence presented during the hearing. They're to consider everything presented and apply the law and the facts as required. So I would ask everyone, with all due respect to the [M]ayor, his email blast must be disregarded. Thank you.

The Board heard testimony from plaintiffs' principal and experts, questions and statements from its engineer and planner, and statements from members of the public. The Board also received a number of plans, letters, other exhibits, and reports from the professionals. At the close of plaintiffs' presentation, the Board voted unanimously to deny plaintiffs' amended application.

8

On April 30, 2019, the Board adopted a resolution memorializing the denial. The resolution comprehensively detailed: (1) the history of the site, including the grant of the prior application; (2) the discovery of the eagle's nest; (3) the modified development plan; (4) the sought after variances; (5) plaintiffs' reasons for why the variances should be granted; and (6) the Board's reasoning for denying the variances.

In May 2019, plaintiffs filed an eight-count complaint against defendants. As relevant here, the second count sought the court to overturn the Board's denial as "arbitrary and capricious"; the fourth count asserted claims under 42 U.S.C. § 1983, the Federal Civil Rights Act; the fifth count asserted claims under N.J.S.A. 10:6-2(c), the New Jersey Civil Rights Act; the sixth count requested that the court appoint a SHO to hold a hearing and decide on the amended application; and the seventh count sought relief under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -50.

The matter was tried before the court on July 15, 2020. The trial included the parties' legal arguments regarding plaintiffs' assertions that the Board's denial of its application was arbitrary and capricious and that a SHO was required.

As to whether the Board's denial was arbitrary and capricious, plaintiffs argued that it "put forth a very extensive case, with a lot of witnesses." Plaintiffs contended that it "went through all of the statutory issues in great depth" and "that [a] compelling case was made that the positive and negative criteria of the variance statute was satisfied. And no contrary case was made. That evidence was, essentially, uncontroverted." In addition, plaintiffs argued "[s]ome of the[ variances] are the same variances . . . in the prior approval." Further, "that this is a Mt. Laurel site and it was part of a settlement agreement, it's part of a judgment of compliance . . . [which] adds considerable weight and authority to the proposition that the Town[ship] has acted unconstitutionally or unlawfully in denying" the amended application. Plaintiffs contended "[t]he Mayor didn't want it. So the[ Board] denied it and that was that."

Plaintiffs acknowledged the Board's attorney "drafted a great resolution," but argued the resolution "creat[ed] arguments for the . . . Board . . . as to why . . . the positive and negative criteria under the variance statute was supposedly not satisfied." Plaintiffs argued the findings were the Board's attorney's and "not [the] Board members' findings," because the Board made no findings, and nor could it have, because there was no contrary evidence or witness testimony.

The Board countered that because it sits in a "quasi judicial fashion," its hearing is not considered an "adversarial proceeding." Therefore, "the Board has no duty to put on facts, nor is it professional[] to counteract anything the applicant has to say." Instead, the Board's role is "to hear the evidence and [apply] . . . the facts . . . to the law and come[] to a certain outcome." Further, while recognizing the expertise of plaintiffs' witnesses, the Board noted that an expert's "opinion is not binding on the Board in any fashion." Instead, "[t]he Board is free to disagree with" an expert "which they did."

In addition, the Board noted that in its approval of the 2016 application, plaintiffs' predecessor in title was granted "two variances" and here plaintiffs sought twelve "total variances." The Board described the amended application as "dramatically different." The Board argued the amended application "needs to be proper for the location, and [it] found it is not."

The Board contended that its resolution "laid out" its reasons for the denial. The resolution contained "credible findings of fact regarding the application and applied those to the standards to accommodate their denial."

The Township asserted that it was "very clear" "that there is no relationship at all between" the 2016 application and the amended application. In addition, the Township argued the Board did its job.

As to the SHO, plaintiffs argued a SHO was necessary because they did not get a "fair hearing." Plaintiffs pondered "how can an applicant get a fair hearing before a Board when a Township issues a press release expressing the bitter opposition of the Mayor of th[e] Town." Plaintiffs contended that it was sure the Board members would say they were not influenced, but "liv[ing] in the real world," the court could not ignore the Mayor's "appoint[ing] powers" and "all kinds of powers." Plaintiffs stated the Mayor just made up that there were "eaglets . . . hatching" on the property and noted that it was "a great way to try to turn the public and the . . . Board against an applicant to say that an applicant [wa]s doing something that jeopardize[d] Bald Eagle eaglets. Hard to imagine a better way, Bald Eagle, symbol of our nation."

In addition, plaintiffs argued the initial press release could not have "poison[ed] the well . . . any worse." Plaintiffs asserted that the statements were "terrible," "atrocious," "unfair," "inappropriate," and successfully "gin[ned] up public opposition" leading to the Board's denial of the application.

Plaintiffs acknowledged they wanted the Mayor to attend a meeting—"to see if the [M]ayor had any problem[s] with anything"—but the Mayor refused. Plaintiffs asserted that instead, the Mayor "laid in the weeds and waited until the

12

matter was poised for public hearing. And then he launched his barrage against the application."

The Board's attorney countered by arguing the plaintiffs received a fair hearing. First, the attorney asserted that the Board dedicated an "entire night" to plaintiffs' amended application. Further, that the plaintiffs' application "was not curtailed in any fashion in the number of witnesses they want[ed] to present, the documents or how long they could take to make their application in chief, respond to questions from the Board . . . the public [or] the Board [p]rofessionals." The Board noted plaintiffs "did[ no]t ask for additional time." Therefore, in terms of "traditional [n]otions of [a] fair hearing [plaintiffs] absolutely got a full and fair hearing."

Second, the Board argued the initial press release was not enough to "influence" or "taint" the hearing. The Board explained that during the Board's hearing its attorney "cautioned the Board about the Mayor's comments and how [the Board was] to handle the application." Further, the Board noted this was "[n]ot the first time this Board . . . dealt with controversial issues . . . ." While not doubting that the Board members "saw" the release and it "was in their mind," the Board asserted that nonetheless it "fully and fairly gave the applicat[ion its] due and properly analyzed the facts and the law in this case."

13

The Board stated "there[ wa]s no proof . . . that there was any undue influence or any influence by the Mayor over the Board [or] the Board's decision," and "no nexus . . . between the Mayor's actions and the Board's outcome."

Further, the Board argued in the absence of "substantial and direct interference with the operation of the Board," the Mayor had a First Amendment[4] right to "say what he likes."

The Township argued "[t]he [M]ayor could have [gone] to the . . . [B]oard" himself and voiced his opposition to the plan. In addition, the Township noted that the Mayor could have sent the Township's attorney to the Board to be heard. The Township asserted that it was irrelevant whether the Mayor spoke "at a council meeting," in a "press release," or "on the Township's website," because he had a "duty" and right to speak out.

Moreover, the Township argued the hearing was "fair" because the Board's attorney's cautionary warning "made sure . . . the [M]ayor's issues never got into th[e] . . . case." In addition, there was "nothing in the record to suggest that" the Board did not do their job.

---

[4] "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend I.

On October 15, 2020, the trial court issued a sixty-four-page written opinion. The court addressed the "proverbial 'elephant in the room' and/or '800 pound gorilla': i.e., the irrefutable evidence of actions taken by the Mayor that preceded the hearing . . . and appear to have pre-ordained the [a]mended [a]pplication's denial; and that along the way, resulted in the subversion of due process and fundamental fairness to" plaintiffs. The trial court stated that "at a bare minimum, those actions only served to further inform and underscore the arbitrariness and unreasonableness of the Board's denial decision."

The trial court found that because of the Mayor's initial press release "all notions of fundamental fairness for the [March 26, 2019] hearing were swept out the door altogether." The judge noted that "[i]nstead of exercis[ing] his right to appear at the hearing, either himself or through the Township['s] attorney, to express his views on the [a]mended [a]pplication, in his official capacity — or, even as a private citizen-resident of the Township    . . ., as was his irrefutable right — the Mayor did neither."

The trial court found that "[i]nstead, unbeknownst to the [plaintiffs], [the Mayor] resorted to surreptitiously authorizing publication of a press release that was posted to the Township's official website to convey his sentiments utilizing

the Township's resources (which release, inferably, was likely email blasted as an E-Newsletter to all Township residents . . . )."

The trial court noted the Mayor's "quotes" in the initial press release were made "well before the proofs were even presented." The court stated that while the Mayor contended it was "wholly unacceptable" that plaintiffs did not do more to "reduc[e] density and in the intensity of the use without requiring all the variances" he found "[p]laintiffs did modify significantly overall square footage for the commercial space" and "at the same time, maintained the [forty-three] affordable unit yield for the Township's benefit as" was provided in the "2016 HEFSP, the 2016 Judgment of Compliance and Repose, and previously approved by the Board."

Moreover, the trial court found that if the Mayor's contention was "not incendiary enough," the Mayor's statement regarding the eaglets was made "at best, in reckless disregard of the truth or, at worst, without any substantiation whatsoever and outright false."

In addition, the trial court found the initial "press release was picked up by the local media almost right away and, from the record, appears to have had its intended, calculated and purposeful effect" because when plaintiffs, and their

16

principals and experts arrived at the Board's meeting, they were "confronted by a standing-room only throng of 150 residents awaiting."

The trial court stated

> [i]nescapably, the Mayor's conspicuous authorized publication of the press release . . . precisely one week prior to the scheduled hearing was akin to figuratively rolling a grenade in on the [amended a]pplication hearing, running away from doing so by not showing up in person to express his view in the public forum ostensibly to intimidate Board members, and to blow it up as it succeeded in doing.

The trial court continued, "prior to the scheduled hearing on the [amended a]pplication and in further reckless disregard of the obvious influence his statements would have, the Mayor launched a unilateral, unrestrained campaign to interfere with the . . . Board['s] application process and stir up public opposition to [p]laintiffs' proposal." The judge found the Mayor's statement "portrayed . . . [plaintiffs'] development proposal in a completely negative light and . . . cast [plaintiff] as a lawbreaker proposing an unlawful development – and, BEFORE what became the uncontroverted proofs to the contrary were even presented." The judge found the Mayor's "statement demonstrated a lack of good faith on the part of the Township."

The trial court noted, "[i]t is clear that the Mayor had, as [p]laintiffs' counsel argued, successfully 'ginned-up' opposition to ensure that in the face of

17

that agitated crowd Board [m]embers acceded to issuing the overtly suggested, if not dictated, denial."

The trial court stated plaintiffs—"regrettably"—"walked into that hearing . . . with both of [their] hands tied behind [their] back, and one of two legs similarly tied up such that [plaintiffs] w[ere] forced to 'hop' through a [four]-hour hearing and presentation of its case that resulted in, arguably, the pre-ordained outcome."

The trial court found "the hearing itself was conducted in a professional and orderly fashion" and noted seventeen "residents stood up and spoke against the application," with one politely complimenting plaintiffs and its professionals. Nonetheless, the trial court sensed "the compelling inference of a fait accompli, if not a fact, and the blatant arbitrariness of the Board's decision." The judge noted that after plaintiffs' closing summation, the "sparse" record "sp[o]k[e] volumes."

The trial court noted the Board did not "open the matter up for discussion among all Board members, especially to address what from the record proved to be overwhelming evidence adduced on behalf of" plaintiffs. Instead, the judge found a Board member "promptly made a motion to 'decline the application,' which was seconded by" another Board member. The judge remarked that "of

the 178-page hearing transcript," the Board's "entire so-called deliberative process and 'analysis'" "took all of [two and one-quarter] pages."

The trial court stated it considered the amended application "on the merits." The court concluded, "based upon the evidence in the record that supported a grant and for . . . [other articulated] reasons, [it] w[ould] reverse and vacate the Board's denial of the [a]mended [a]pplication, and enter judgment . . . reversing the . . . Board's denial and granting the [u]se [v]ariance and [b]ulk [v]ariance relief sought by the [p]laintiffs . . . ."

In addition, the trial court reflected on the New Jersey Supreme Court's promise to "act decisively" in Mt. Laurel matters. The judge noted that "when a municipality has demonstrated and is determined to be non-compliant with its affordable housing obligations, 'a strong judicial hand [must be] used,'" citing Mt. Laurel II, 92 N.J. at 199.

The judge found it ironic that "but for this singular transgression of the . . . Board that was inescapably provoked . . . by the Mayor's interference, [the] Township proactively had come into voluntary compliance with its Mt. Laurel obligations." The judge found the Township was "diligently implementing" its Mt. Laurel obligations. Further, the judge stated the Township "to date ha[d]

taken commendable steps to come into voluntary compliance with its . . . affordable housing obligations and [wa]s actually implementing them."

Nonetheless, the trial court concluded:

> a strong judicial hand will be used by the [c]ourt in this discrete instance to rectify the misguided, manipulated, if not orchestrated denial of this [a]mended [a]pplication and thereby ensure [the] Township's continued, unfettered compliance with its continuing obligations to implement its 2016 HEFSP, the requirements of the 2016 Judgment of Compliance and Repose, and, a fair processing on the balance of [plaintiffs'] development application.

Moreover, concerned with plaintiffs' need for site plan approval, the trial court determined that "this case cries out for the restoration of fundamental fairness, reason and rationality to prevail, which" was "only achievable through the interposition of neutrality." The judge found "[t]he taint to the application [wa]s insurmountable. The damage done was and is irremediable." The judge stated he had "no confidence that [plaintiffs] can or will get a fair hearing on the site plan aspects of its [a]mended [a]pplication before the . . . Board, and certainly without history repeating itself."

In voicing its concern for "history repeating itself," the trial court took judicial notice of another communication from the Mayor. The trial court described the Mayor as "[u]ndaunted" and noted that "following the . . .

20

institution of suit here, the Mayor was again reported on the Township's own website to have made . . . comments as to the [p]laintiffs and . . . Board's decision." The trial court described the Mayor's communication as "disparaging and [contained] purposely misleading references to the [p]laintiffs." The "post-complaint" press release stated:

Mayor Gerald Tamburro Will Not Be Silenced

Mayor Gerald Tamburro Tells "Bald Eagle Developer" That He Will Not Be Silenced

Developer Files Lawsuit Against the Mayor, Demanding He Keep Quiet in His Opposition to SPII-LLC development on Route 33:

\* \* \*

"The so-called "Bald Eagle Developer," who has failed in obtaining Zoning Board approval to increase the net density to construct a large, mixed-use development within the vicinity of the site of a bald eagle's nest has filed a lawsuit against Monroe, and specifically named Monroe Mayor Gerald W. Tamburro as a defendant.

'We will not be bullied by aggressive developers and their lawyers, who are focused on maximizing their profits, going beyond the court ordered settlement, no matter the detriment to the people of Monroe and our environment,' Tamburro said. 'I have stated my opposition to this proposed development in my capacity as a concerned Monroe resident and an American who is entitled to free speech. If this developer has a problem with my criticism, that's his problem.'"

A-2471-22

Since the discovery of the nest, the Bald Eagle Developer, known in municipal filings as "SPII-LLC," reconfigured the development plan by squeezing the original number of units into less developable land. To do this, he is adding [four]-story apartments, maintaining 206 housing units and reducing the development's commercial component.

SPII-LLC, appeared before the [T]ownship [Z]oning [B]oard on March 26, trying to get approval of their amended plan to cram 206 new housing units on a smaller buildable footprint, in an environmentally-sensitive area of Monroe, near the Millstone River.

Prior to the meeting, Mayor Tamburro spread the word that the area is home to a bald eagle's ne[s]t perched near the Millstone River. Under state and federal law, it can be illegal to construct buildings within 660 feet of the nest.

Hundreds of residents heard the Mayor's concerns and turned out for the meeting, in which the [Z]oning [B]oard rejected the application.

'Suing the town, and me personally, will do absolutely nothing to change the position of the [Z]oning [B]oard, which has made its rulings,' Tamburro said. 'And as a resident who cares deeply about this community, it is a decision I fully support and I will not be silenced.'"

Therefore, the trial court concluded, "because the process was so irreparably, irremediably infected with a taint of the Board, hearing on the site plan aspects of the [a]mended [a]pplication will be ordered to be conducted before a" SHO. The trial court imposed the remedy stating "[i]t is well-settled

22

that the [c]ourt may divest a municipal planning board [or zoning board of adjustment] to hear a development application and appoint a" SHO "to review said application, subject to [c]ourt review and approval." (third alteration in original).

In appointing the SHO, the trial court relied upon the New Jersey Supreme Court's advice that given the constitutional dimension of affordable housing, courts were not confined to apply "conventionally used" remedies and "the appointment of a master . . . [i]s a readily available device . . . to be liberally used," citing Mt. Laurel II, 92 N.J. at 283.

Moreover, the trial court relied on our opinion in Cranford Development Associates, LLC v. Township of Cranford, 445 N.J. Super. 220 (App. Div. 2016), noting we affirmed the appointment of a SHO "to review site plan applications for builder's remedy litigation." The trial court noted that in Cranford, we recognized "the [t]ownship's record of obstructing affordable housing projects, and the [p]lanning [b]oard's past hostility to a much more limited affordable housing plan." Id. at 232-33.

In drawing a parallel from Cranford to this matter, the trial court found:

> [h]ere, the hostility to development on the [p]roperty displayed by the Mayor in his press release as to the [p]laintiffs' [a]mended [a]pplication, and disdain carried over through him and his public statements and

23

exhibited by Board members, during the hearing toward this affordable housing project, all as divulged in the record below, justifie[d] a conclusion that the same remedy should be employed in this instance.

The trial court stated that "[p]ermitting the . . . Board to once again rule upon an application concerning [plaintiffs' p]roperty would lead to nothing but heightened antagonism, extraordinarily lengthy, expensive hearings resulting in another pre-ordained denial, and yet more litigation and delay."

Thus, the judge concluded the site plan application would "be conducted before a neutral party [the SHO] appointed by the [c]ourt with full opportunity extended to any and all interested or affected parties, and pursuant to the procedures laid out in the [c]ourt's accompanying [o]rder."

Thereafter, the trial court executed orders of: (1) June 16, 2021, modifying the October 15, 2020 order but denying defendants' motion for reconsideration; (2) September 14, 2021, remanding to the SHO, as part of its site plan review responsibilities, issues concerning whether the "installation of a traffic light on Route 33 sh[ould] . . . be deemed a condition of approval for [p]laintiffs' proposed development"; and (3) August 9, 2022, adopting the final resolution of the SHO, and granting plaintiffs preliminary and final major site plan approval.

24

On appeal, the Township argues: (1) that in the absence of an actual Mt. Laurel violation, the trial court lacked a legal basis to appoint the SHO; (2) the procedures for the SHO to carry out its functions were flawed; (3) the trial court's finding, that the Mayor's comments unduly prejudiced the Board, was used as a pretext to appoint the SHO; and (4) the trial court's adoption of the SHO's recommendations was flawed.

In its cross-appeal, the Board adopts the Township's and the Mayor's arguments and adds that its denial of plaintiffs' amended application was proper, and plaintiffs failed to sustain their burden. The Board emphasizes the differences between the approved plan and the "compressed" amended application that required "countless variances." Further, the Board argues it "is not obligated to accept the inconsistent documentary evidence and professional testimony proffered by" plaintiffs.

Plaintiffs counter that the: (1) Mayor tainted the Board's hearing and the Board's denial of its amended application—based on the "unreasonabl[e]" rejection of their experts' testimony and "bare allegations or unsubstantiated beliefs"—was arbitrary, capricious and unreasonable, and (2) appointment of

the SHO and the implemented procedures were proper and the SHO's recommendations to the trial court were lawful.

Ordinarily, "[t]he scope of appellate review of a trial court's fact-finding function is limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). Generally, "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Id. at 411-12. "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). We recognize that when a "trial court 'hears the case, sees and observes the witnesses, [and] hears them testify, it has a better perspective than a reviewing court in evaluating the veracity of witnesses.'" Ibid. (alteration in original) (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988)) (internal quotation marks omitted).

However, when a trial court's findings are "based on its review of . . . transcripts [it] is not entitled to the same deference as [when] the [trial] court's findings 'which are substantially influenced by [its] opportunity to hear and see the witnesses.'" State v. Nash, 212 N.J. 518, 552 (2013) (quoting State v. Elders, 192 N.J. 224, 244 (2007)) (internal quotation marks omitted). "That is because

we are equally capable of evaluating the strength of the evidence in the trial record." Ibid.

"A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). We review questions concerning the interpretation or determination of law de novo. Moreover, "[w]e . . . review mixed questions of law and fact de novo." Cumberland Farms, Inc. v. N.J. Dept. of Env't Prot., 447 N.J. Super. 423, 438 (App. Div. 2016).

In this section, we address the Township's appeal, and the Board's cross-appeal, of the trial court orders of October 14, 2020, October 15, 2020, June 16, 2021, September 14, 2021, and August 9, 2022. We consider whether the: (A) Mayor's initial press release rendered the Board's hearing unfair; (B) Mayor's initial press release and post-complaint press release required the appointment of the SHO; and (C) Board's denial of plaintiffs' amended application was arbitrary, capricious or unreasonable.

A.

Our analysis of the Mayor's initial press release starts with the recognition that "New Jersey's Constitution guarantees individuals a broad, affirmative right

to free speech." Mazdabrook Commons Homeowners' Ass'n v. Khan, 210 N.J. 482, 492 (2012). The Constitution provides: "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right." N.J. Const. art. I, ¶6. "New Jersey's Constitution's free speech provision is an affirmative right, broader than practically all others in the nation." Green Party v. Hartz Mt. Indus., 164 N.J. 127, 145 (2000).

In Central 25, LLC v. Zoning Board of City of Union City, we recognized that a "[m]ayor, as an elected public official and a resident of the [c]ity, had the right to express his opinion on [a pending application for a] proposed project." 460 N.J. Super. 446, 459 (App. Div. 2019). Here, similarly the trial court recognized the Mayor's "irrefutable right" to freedom of speech.

Nevertheless, the trial court determined that the Mayor's method of communication and the content of the communication rendered the Mayor's initial press release a "direct, calculated interference with the quasi-judicial process[] . . . for the fair hearing and consideration of the [p]laintiffs' [a]mended [a]pplication by the . . . Board."

Thus, we must consider whether the method the Mayor used to issue the initial press release and the content of the Mayor's initial press release interfered with the Board's hearing, rendering it unfair.

The trial court faulted the method the Mayor used to issue the press release. It found the Mayor's release was made: (1) "surreptitiously"; (2) "posted to the Township's official website"; (3) "likely email blasted as an E-Newsletter to all Township residents who subscribed to the website or otherwise taken from electorate lists"; (4) not at the hearing through the Township's attorney or in person in his capacity as the Mayor or as a resident; (5) while "running away"; and (6) "in the eleventh hour."

In Central 25, the mayor, after meeting with a potential applicant, sent two communications during the pendency of the application, but before the hearing. 460 N.J. Super. at 452. The first was "embossed with the seal of the City . . ., [and] identif[ied] an affiliation with the Department of Public Safety, and list[ed] the City Hall as its address." Ibid. The second "include[d] a photograph of the [m]ayor with the City's seal embossed above it," id. at 454 n.5, and was "sent from [the mayor] on official City stationery." Id. at 454.

In Central 25 and here, the mayors openly—not secretly—expressed themselves, cloaked in their official capacities. Here, we disagree with the trial court's inference that the Mayor's communication should have been made through the Township's attorney or in person. The Mayor has the right to express himself, and not use the attorney as a proxy. Further, we envision added

29

pressure being created in a hearing by the Mayor's personal appearance. Therefore, we conclude there was nothing in the Mayor's methodology—use of the Township's website or E-Newsletter—that interfered with or rendered the hearing unfair.

We next turn to the content of the Mayor's communication to determine whether it interfered with the Board's hearing, rendering it unfair. In this respect, the trial court highlighted that the Mayor stated: (1) "that the [p]laintiffs could have done more such as reducing [overall square footage] without requiring all the variances sought" and (2) "[a]s the . . . [B]oard votes, eaglets are beginning to hatch."

As to the first statement, the trial court stated the plaintiffs "did modify significantly [the] overall square footage . . . and, at the same time, maintained the [forty-three] affordable unit[s]." Although factually the trial court disagreed with the Mayor's statement, we conclude the statement was not "incendiary" as the trial court described. Instead, the Mayor merely stated his opinion regarding the amended application. Plaintiffs were left to their proofs in front of the Board.

In addition, the trial court took issue with the Mayor's mention of "eaglets hatching" on the property. In this respect, the trial court raised two issues: (1)

30

public opinion and (2) the impact of the assertion that eaglets were hatching and are our national symbol on the Board.  Our focus is on the Board, not the general public.  The Mayor's initial press release may have, as the trial court described, led "a throng of 150 residents" to attend the hearing.  However, having residents attend public hearings is not to be discouraged.  Indeed, we "should encourage citizens of a democracy to be more engaged, rather than less, in the government process."  Tarus v. Borough of Pine Hill, 189 N.J. 497, 508 (2007).

Further, there is no evidence that the Board's hearing was unfair because of the Mayor's mention of eaglets, even if it was hyperbole that they were then "hatching," or that eagles are "our national symbol."   Certainly, the Board members and plaintiffs had the opportunity to address any concerns with the eaglets during the hearing.

In Central 25, the mayor's communications:  (1) stated he was " personally not in favor of the" proposal, id. at 453; (2) stated he did not "believe [the proposal] would benefit or improve your neighborhood," ibid.; (3) "ask[ed residents to] attend the meeting . . .," ibid.; and (4) asked residents to "voice [their] opinion and concerns." Ibid.  We noted the mayor's communications "exhorted the area residents" and were a "condemnation of plaintiff[]s' application."  Id. at 454.  In addition, we recognized the mayor staged an

"active[] campaign[] against plaintiff's application." Id. at 459. We stated that the mayor engaged in "aggressive opposition" and "aggressive advocacy against the granting . . . of the application." Id. at 466.

Measured on its own or against the mayor's actions in Central 25, we are convinced here that the content of the Mayor's initial press release did not render the Board's hearing unfair.

We do not minimize the trial court's concern that the Mayor's statement interfered with the Board. The exercise of freedom of speech has its outer limits, "[t]he most stringent protection of free speech would not protect a man [or woman] in falsely shouting fire in a theatre and causing a panic." Schenck v. U.S., 249 U.S. 47, 52 (1919). Nonetheless, we reiterate that a "[m]ayor, as an elected public official and a resident . . . ha[s] the right to express his opinion on [a pending application for a] proposed project." Central 25, 460 N.J. Super. at 459. Therefore, we conclude there was nothing in the manner or content of the Mayor's initial press release that interfered with or rendered the Board's hearing of plaintiffs' amended application unfair.

Aside from the permissibility of the Mayor's statement, we note other factors that lend themselves to the conclusion that the hearing was fair. First, "[t]he law presumes that boards of adjustment and municipal governing bodies

will act fairly and with proper motives and for valid reasons." Kramer v. Bd. of Adjustment, 45 N.J. 268, 296 (1965). "Suffice it to state that a hearing cannot be fair if the hearing body prejudges the matter before the hearing begins." Nanavati v. Burdette Tomlin Mem'l Hosp., 107 N.J. 240, 246-47 (1987). However, "a hearing before an administrative tribunal acting quasi-judicially implies that the factfinder 'shall be bound in good conscience to consider the evidence, to be guided by that alone, and to reach his [or her] conclusion uninfluenced by extraneous considerations.'" Kramer, 45 N.J. at 280 (quoting Pa. R.R. Co. v. N.J. State Aviation Comm'n, 2 N.J. 64, 70 (1949)). Here, there is no evidence the Board did otherwise. Second, there is no evidence to suggest the Mayor took any steps to interfere with the hearing.

Third, the trial court found "the hearing itself was conducted in a professional and orderly fashion." Fourth, there is no suggestion the Board did not afford plaintiffs the time they required to present their application.

Fifth, we credit the Board's attorney's cautionary instruction to the Board that: (1) the Mayor's statement was not evidence in the hearing; (2) "[t]he only thing that the [B]oard c[ould] consider [wa]s evidence presented during the hearing"; (3) the Board members were only "to consider everything presented and apply the law and the facts as required"; and (4) "with all due respect to the

33

[M]ayor, his [initial press release] must be disregarded."  We have no reason to conclude the Board members ignored counsel's instruction.

Therefore, for all of the foregoing reasons, we conclude there is no evidence to establish the Mayor's initial press release rendered the Board's hearing unfair.

### B.

The trial court's concern with the Mayor's statements led it to appoint the SHO.  Because of the Mayor's initial press release, the court found "[t]he taint to the application [wa]s insurmountable.  The damage done was and is irremediable."  The court stated it had "no confidence that [plaintiffs] can or will get a fair hearing on the site plan aspects of its [a]mended [a]pplication before the . . . Board."  The trial court determined "this case cries out for the restoration of fundamental fairness, reason and rationality to prevail, which" was "only achievable through the interposition of neutrality."  However, as we have stated, the Mayor's initial press release was permissible and did not render the Board's hearing unfair.  Therefore, the appointment of the SHO was not necessary or supported on the basis of the Mayor's initial press release.

In addition, not only did the Mayor's initial press release inform the trial court's decision to appoint the SHO, but the trial court also considered the

34

Mayor's post-complaint press release in making the appointment. The trial court resolved not to let "history repeat[] itself."

However, in issuing the post-complaint press release, the Mayor again merely exercised his right to freedom of speech and, as we have discussed, his use of "the Township's own website" and "an E-Newsletter to residents" to do so were permissible.

Further, as to the content of the post-complaint press release, the trial court found the Mayor's statement, "disparag[ed] and [made] purposely misleading references to . . . [p]laintiffs." However, in the post-complaint press release, the Mayor stated that plaintiffs filed a lawsuit against him and he would not be silenced. Both of those statements were true.

As to plaintiffs, the Mayor stated they: (1) were the "Bald Eagle Developer"; (2) "failed in obtaining . . . Board approval"; (3) were "aggressive developers" and "focused on maximizing their profits, going beyond the court ordered settlement, no matter the detriment to the people of Monroe and our environment"; and (4) were "squeezing the original number of units into less developable land." We conclude that there is nothing in these statements that went beyond the permissible parameters of free speech.

Therefore, the SHO was not properly imposed on the basis of the Mayor's initial or post-complaint press releases.

We do not need to reach the Township's assertion that a SHO is only permissible in a "builder's remedy" suit. Here, the trial court determined the Mayor's statements were impermissible and wedded that finding with the fact that the amended application included a part of the Township's affordable housing obligation, to appoint the SHO. Because we determine the Mayor's statements were permissible, we conclude the appointment of a SHO was improper under the circumstances. Our analysis needs to go no further, especially considering, as the trial court found, the Township's diligence in meeting its Mt. Laurel obligations.

## C.

The trial court stated it rejected the Board's denial of plaintiffs' amended application "on the merits," seemingly divorced from the Mayor's perceived impermissible initial press release. However, we conclude the trial court's attempt was ineffective, because its concern with the Mayor's initial press release permeated every aspect of its decision to conclude the hearing was unfair and reverse the Board's denial and grant the variance itself.

A-2471-22

Indeed, the trial court found the Mayor's statement: (1) "preordained the [a]mended [a]pplication's denial"; (2) "resulted in the subversion of due process and fundamental fairness"; (3) "inform[ed] and underscore[d] the arbitrariness and unreasonableness of the Board's denial decision"; (4) "swept out the door altogether" "all notions of fundamental fairness for the hearing"; (5) resulted in the Board's "accede[nce] to issuing the overtly suggested, if not dictated, denial"; (6) created "the compelling inference of a fait accompli, if not a fact, and the blatant arbitrariness of the Board's decision"; (7) acted "akin to figuratively rolling a grenade in on the [amended a]pplication hearing, running away from doing so by not showing up in person to express his view in the public forum ostensibly to intimidate Board members, and to blow it up as it succeeded in doing"; and (8) was "tantamount to direct, calculated interference with the quasi-judicial process[] . . . for the fair hearing and consideration of the [p]laintiffs' [a]mended [a]pplication by the . . . Board."

In light of the trial court's strong language regarding the Mayor's conduct, and because our review is de novo, we address the parties' arguments regarding whether the Board's denial of plaintiffs' amended application was arbitrary, capricious or unreasonable.

"The role of a court reviewing a decision by a board of adjustment is strictly circumscribed." N.Y. SMSA Ltd. P'ship v. Bd. of Adjustment of Twp. of Bernards, 324 N.J. Super. 149, 164 (App. Div. 1999). "[B]ecause of their peculiar knowledge of local conditions," local boards are "allowed wide latitude in the exercise of their delegated discretion." Booth v. Bd. of Adjustment, 50 N.J. 302, 306 (1967). A board's actions are thus presumed valid, and "the party attacking such action has the burden of proving otherwise." Bernards, 324 N.J. Super. at 163.

"It is well-settled that a decision of a zoning board may be set aside only when it is 'arbitrary, capricious or unreasonable.'" Cell S. of N.J. v. Zoning Bd. of Adjustment, 172 N.J. 75, 81 (2002) (quoting Medici v. BPR Co., 107 N.J. 1, 15 (1987)). "[A]rbitrariness or unreasonableness, . . . have been interpreted to mean 'willful and unreasoning action, without consideration and in disregard of circumstances.'" Seaview Harbor Realignment Comm., LLC v. Twp. Comm. of Egg Harbor Twp., 470 N.J. Super. 71, 94 (App. Div. 2021) (quoting D'Anastasio Corp. v. Twp. of Pilesgrove, 387 N.J. Super. 247, 251 (Law Div. 2005)). A "[b]oard's factual conclusions are entitled to great weight and . . . ought not be disturbed unless there is insufficient evidence to support them." Rowatti v. Gonchar, 101 N.J. 46, 52 (1985). "Where there is room for two opinions, action

is [valid] when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached." Worthington v. Fauver, 88 N.J. 183, 204-05 (1982) (alteration in original) (quoting Bayshore Sewerage Co. v. Dept. Env't Prot., 122 N.J. Super. 184, 189 (Ch. Div. 1973)). Therefore, "[t]he court will not substitute its judgment for that of the board, and the board's action will be set aside only if the court finds a clear abuse of discretion." Bernards, 324 N.J. Super. at 164.

In determining whether a board properly exercised its discretion, "[c]ourts give greater deference to variance denials than to grants of variances, since variances tend to impair sound zoning." Med. Ctr. at Princeton v. Twp. of Princeton Zoning Bd. of Adjustment, 343 N.J. Super. 177, 199 (App. Div. 2001). "Where a board of adjustment has denied a variance, the plaintiff has the heavy burden of proving that the evidence presented to the board was so overwhelmingly in favor of the applicant that the board's action can be said to be arbitrary, capricious or unreasonable." Med. Realty Assocs. v. Bd. of Adjustment of City of Summit, 228 N.J. Super. 226, 233 (App. Div. 1988).

Under N.J.S.A. 40:55D-10(g)(2), the Board is required to pass a resolution and "include findings of fact and conclusions based thereon in each decision on any application for development and shall reduce the decision to writing." "It

is the [r]esolution, and not the [b]oard [m]ember deliberations, that provides the statutorily required findings of fact and conclusions." N.Y. SMSA, L.P. v. Bd. of Adjustment of Twp. of Weehawken, 370 N.J. Super. 319, 334 (App. Div. 2004). In fact, the board members do not have to "discuss the application at all, it being sufficient that the application be either approved or disapproved by voice vote and that thereafter a memorializing resolution must be adopted setting forth a clear statement of reasons for the grant or denial of the variance." Cox & Koenig, N.J. Zoning and Land Use Administration § 19-7.1 (2025).

"Zoning boards may choose which witnesses, including expert witnesses, to believe." Bd. of Educ. of City of Clifton v. Zoning Bd. of Adjustment of City of Clifton, 409 N.J. Super. 389, 434 (citing El Shaer v. Planning Bd. of Twp. of Lawrence, 249 N.J. Super. 323, 329 (App. Div. 1991); Hawrylo v. Bd. of Adjustment Harding Twp., 249 N.J. Super. 568, 579 (App Div. 1991); Allen v. Hopewell Twp. Zoning Bd. of Adjustment, 227 N.J. Super. 574, 581 (App. Div. 1988)). "However, to be binding on appeal, that choice must be reasonably made." Ibid. "In addition, the choice must be explained" and "[t]he board cannot rely upon unsubstantiated allegations." Id. at 434-35.

Here, the Board's decision was not based on unsubstantiated allegations. Instead, the Board considered all the evidence and was not sufficiently

convinced that plaintiffs established the basis for the requested relief. In adopting its memorializing resolution, the Board detailed each sought after variance and explained particularly why it was not so convinced. In light of our standard of review, we conclude the Board's denial was not arbitrary, capricious or unreasonable.

Therefore, because we conclude: (1) the Mayor's initial press release was permissible and did not render the Board's hearing on plaintiffs' amended application unfair; (2) the Mayor's post-complaint press release was permissible and, on its own or in combination with the permissible initial press release, would not have rendered plaintiffs' site plan application hearing unfair and thus the appointment of the SHO was in error; and (3) the Board's denial of plaintiffs' amended application was not arbitrary, capricious or unreasonable, we reverse the trial court's decisions and vacate the trial court's orders of October 14, 2020, October 15, 2020, June 16, 2021, September 14, 2021, and August 9, 2022.

## III.

In this section, we consider plaintiffs' appeal of the trial court's grant of summary judgment to defendants on their claims for defendants' alleged

violations of the Federal Civil Rights Act, 42 U.S.C. § 1983;[5] New Jersey Civil

Rights Act, 10:6-2(c);[6] and New Jersey Law Against Discrimination (NJLAD),

N.J.S.A. 10:5-1.[7]

---

[5] 42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[6] N.J.S.A. 10:6-2(c) provides:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

[7] N.J.S.A. 10:5-13(a)(2) provides: "Any complainant, including any person claiming to be aggrieved by . . . an unlawful discrimination may . . . initiate suit in Superior Court."

A-2471-22

We review the grant of summary judgment de novo, applying the same legal standards as the trial court. Green v. Monmouth Univ., 237 N.J. 516, 529 (2019).

Under Rule 4:46-2(c):

> The judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.

In considering the invoked statutes, we note that plaintiffs' claims emanate from the Mayor's actions and the effect those actions purportedly had on the Board. In considering plaintiffs' substantive due process claims, the trial court

> found the conduct of the Mayor's letter writing campaign to be offensive, with an inferred or even explicitly stated intent to interfere with the . . . Board's independent evaluation of the use variance application that came before it, and to even intimidate and force the pre-ordained outcome of its denial.

Nonetheless, the trial court concluded its "findings d[id] not meet the heightened bar for testing the [p]laintiffs' civil rights claims as would 'shock the conscience'

43

in the constitutional sense," quoting <u>Rivkin v. Dover Twp. Rent Leveling Bd.</u>, 143 N.J. 352, 366 (1996).

Moreover, the trial court found "[p]laintiffs did suffer a deprivation of procedural due process." Nonetheless, the trial court found that its reversal of the Board's decision and its appointment of the SHO, "rectified a deprivation of the [p]laintiffs' protected property interest."

With regard to plaintiffs' NJLAD claim, the trial court determined that even if it were to assume

> that the [p]laintiffs had standing to bring claims for violations of the NJLAD that they claim were committed by the [d]efendants here, they would still have to demonstrate that those violations were the direct result of discriminatory conduct, severe, or pervasive, to warrant an award of damages and other relief under the NJLAD. They cannot.

Because we conclude the Mayor's initial press release was permissible, and did not render the Board's hearing unfair, and the Board's denial of plaintiffs' amended application was not arbitrary, capricious or unreasonable, we conclude plaintiffs could not maintain causes of action as a matter of law under the invoked statutes. Since we review orders on appeal, rather than a trial court's legal reasons, we affirm the grant of summary judgment as to these claims although for reasons other than those expressed by the trial court. <u>See</u> <u>Isko v.</u>

44

Planning Bd. of Livingston, 51 N.J. 162, 175 (1968), abrogated on other grounds by Com. Realty Res. Corp. v. First Atl. Props. Co., 122 N.J. 546, 565 (1991). "[I]t is well-settled that appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion." Hayes v. Delamotte, 231 N.J. 373, 387 (2018) (quoting Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001)). Therefore, we affirm the trial court's order of March 10, 2023, although for reasons other than those stated by the trial court.

We reverse and vacate the October 14, 2020, October 15, 2020, June 16, 2021, September 14, 2021, and August 9, 2022 orders. We affirm the March 10, 2023 order.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division